MICHIGAN BROADCASTING COMPANY *v.* SHAWD.

1. CONTRACTS—NEGOTIATION—MEETING OF MINDS.

The disposition to negotiate, or even to trade, is not the same as a trade; it being necessary that the minds of the parties be brought into a state of union and concurrence in favor of the specific arrangement or transfer to effect a bargain or contract.

2. SAME—ORAL OR WRITTEN CONTRACTS.

Whether the contract is of that class which are usually found to be in writing; whether it is of such nature as to need a formal writing for its full expression; whether it has few or many details; whether the amount involved is large or small; whether .it is a common or unusual contract; whether the negotiations themselves indicate that a written draft is contemplated as a final conclusion of the negotiations are matters to be considered in determining whether or not an oral contract has been effected or whether the parties intend that there be a written contract as a final result.

3. SAME—WRITTEN DOCUMENT AS MEMORIAL.

If the parties indicate that the expected document is to be a

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 12 Am Jur, Contracts § 19.
[2] 12 Am Jur, Contracts § 23.
[2-4] 12 Am Jur, Contracts § 25.
[5] 3 Am Jur, Appeal and Error § 824.

mere memorial of operative facts already existing, its non-existence does not prevent those facts from having their normal legal operation.

4. SPECIFIC PERFORMANCE—ORAL CONTRACTS—EVIDENCE.

Finding of trial court, in suit for specific performance of an alleged oral agreement for the purchase and sale of corporate stock of a radio corporation, that no enforceable agreement had been arrived at between the parties *held*, justified, where claim that a final contract had been arrived at was not made until after defendant had sold to another party and it appears that both parties had looked toward a written agreement, that the negotiations were complex, transaction involved an amount that was out of the ordinary and the sale was of a nature usually found to be in writing.

5. APPEAL AND ERROR—QUESTIONS REVIEWABLE—STATUTE OF FRAUDS —MUTUALLY OBLIGATORY CONTRACT OF A CORPORATION.

Whether alleged contract for sale of stock of a radio corporation was within statute of frauds and whether it was mutually obligatory since plaintiff was a corporation, are not determined, where no binding agreement is found to have existed in suit for specific performance.

Appeal from Muskegon; Beers (Henry L.), J. Submitted April 15, 1958. (Docket No. 57, Calendar No. 47,229.) Decided June 11, 1958.

Bill by Michigan Broadcasting Company, a Delaware corporation, against Arch Shawd for specific performance of alleged oral agreement for the purchase and sale of his corporate stock in a radio station. Bill dismissed. Plaintiff appeals. Affirmed.

*Hathaway, Latimer, Clink & Robb (Roger N. Turner,* of counsel), for plaintiff.

*Parmenter & Forsythe* and *Lou L. Landman,* for defendant.

BLACK, J. Plaintiff seeks specific performance of an alleged oral agreement for purchase and sale of

all of the common voting stock of Ashbacker Radio Corporation. The stock was owned by defendant. The agreed purchase price as claimed was $230,000. The decisive question is whether the parties did agree—whether their minds "met"—to buy and sell as alleged by plaintiff. The chancellor, following trial of the case made by plaintiff's bill, found for defendant. The bill was dismissed. Plaintiff appeals and states the above identified question as follows:

"Did the parties enter into an oral agreement on December 13, 1956, whereby plaintiff, Michigan Broadcasting Company, agreed to purchase from defendant, Arch Shawd, and defendant agreed to sell to plaintiff all of the common voting stock of Ashbacker Radio Corporation?"

The parties negotiated and renegotiated at length. They were represented by respective counsel throughout their dealings. Much was agreed upon; that is clear. They intended from the very nature of the projected transaction to reduce to an executed writing that which both were aiming at. Defendant finally and without obligation to plaintiff sold the stock elsewhere, or depending on viewpoint, refused to go through with an orally-agreed trade of stock for money. Like others the courts have seen in endless numbers, our problem thus depends for its solution on oral testimony and the occasional if not chronic uncertainties thereof.

Such being our premises of approach, it is well that visible legal beacons be considered prior to review of the conflicting testimony and the chancellor's evaluation thereof. We were told—in a similar case involving scotched negotiations toward purchase and sale of corporate stock,—over the signatures of the renowned "big four" of our Court (*Peek* v. *Detroit Novelty Works,* 29 Mich 313, 315):

"Now, there is a clear distinction between a determination in the mind of a party to purchase particular property from another, and which that other is willing to sell, and an actual concluded agreement which comprehends a sale. The disposition to negotiate, or even to trade, is not the same as a trade.

"The decision in the mind or councils of a party to buy may be settled; but unless such party goes further, and in some way deals with the other on the footing of a trade, unless in some form the minds of the parties are brought into a state of union and concurrence in favor of the specific arrangement or transfer, there can be no bargain."

Later, in *McConnell* v. *Harrell & Nicholson Co.*, 183 Mich 369, 373, 374, our Court adopted from Maine the following suggested "aid in determining the intention of the parties" in cases like this:

"In determining which view is entertained in any particular case, several circumstances may be helpful, as: Whether the contract is of that class which are usually found to be in writing; whether it is of such nature as to need a formal writing for its full expression; whether it has few or many details; whether the amount involved is large or small; whether it is a common or unusual contract; whether the negotiations themselves indicate that a written draft is contemplated as a final conclusion of the negotiations. If a written draft is proposed, suggested, or referred to during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract."*

This comports with 1 Restatement, Contracts, § 26, pp 33, 34, headed *"Existence of contract where written memorial is contemplated."* Comment (b), of said section 26, p 34, proceeds:

---

* Citing the case from which this quotation was so adopted (*Mississippi & D. S. S. Co.* v. *Swift*, 86 Me 248, 259 [29 A 1063, 41 Am St Rep 545]), Williston qualifiedly concludes that "the ultimate question is one of fact as to the intention of the parties" (1 Williston on Contracts [3d ed], § 28, p 68).

"b. The matter may be put in this way: If the parties indicate that the expected document is to be a mere 'memorial' of operative facts already existing, its nonexistence does not prevent those facts from having their normal legal operation. What that operation is must be determined largely by oral testimony, or by preliminary or only partially complete writings. If the parties indicate that the expected document is to be the exclusive operative consummation of the negotiation, their preceding communications will not be operative as offer or acceptance. This also must be shown largely by oral testimony."

Plaintiff relies, in substance, on the following proof: That in early December, 1956, it received from a "radio station broker of many years experience" a sales brochure setting forth in detail the financial condition and market worth of radio station WKBZ in Muskegon (owned by Ashbacker Radio Corporation); that on inducement of such brochure plaintiff telephoned the broker for the purpose of arranging a meeting (with defendant as owner of the Ashbacker stock); that the arranged meeting took place December 11, 1956, on the radio station premises, as a result of which plaintiff's representatives informed defendant that it was ready to buy the subject stock for the price named in the brochure, that is, $225,000;* that certain additional details requisite to continuation of negotiations were considered on the occasion followed by mutual declaration of the respective parties that "it was a deal" (subject, so far as defendant was concerned, to his desire "to discuss the matter with his wife overnight and let them know the following day"); that the next morning defendant "told the broker

---

* In the course of negotiations the price was "upped" (to $230,000) to make an adjustment with respect to outstanding preferred stock of Ashbacker Radio Corporation.

his decision was to sell;" that the broker suggested that plaintiff should pay 10% of the brochured price, whereupon plaintiff's representative obtained a check in the sum of $23,000, made payable to defendant, and brought it along when the parties, by arrangement, met again on December 13th; that defendant advised it was not necessary to pay anything in earnest; that the parties after further consideration of particulars repaired to the office of defendant's attorney, Mr. Landman, where defendant told Landman that he had made a deal for the radio station and "wanted to put into writing an agreement" that had been reached with the Holmes brothers (negotiating for plaintiff); that Landman was thereupon directed to draw up the requisite agreement; that defendant outlined the terms, Landman wrote the required notes in longhand, read them aloud to see if they agreed with the understanding, and that Landman thereupon went to work on the draft plaintiff claims accurately reflects the final oral agreement of the parties.*

It is unnecessary to consider, further, the evidentiary facts and inferences on which plaintiff relies. Landman, over the intervening week end, completed his drafting work and (with or without defendant's knowledge or approval depending on disputed interpretation of testimony) sent the draft to plaintiff's attorney with a letter of transmittal reading, in part, as follows:

"Enclosed you will find a draft of the proposed contract for sale of Ashbacker Radio Corporation stock by my client, Arch Shawd, to your client, Michigan Broadcasting Company. I dictated this agreement before receiving any information respected

---

* The unsigned draft, received as plaintiff's exhibit 9, consists of 10 pages of appellant's appendix. It includes the involved details to which a skilled draftsman expectably gives attention when he writes with one eye on tax regulations and the other on insertions called for by longhand notes made during a complicated business conference.

[*sic*] the suggested change in the terms of the trans-action. The enclosed draft incorporates the various understandings which were reached at our meeting of the 14th.

"I have today received Mr. David N. Holmes' letter and memorandum suggesting a complete liquidation of the corporation within the 12 months permitted under the code and sale of the physical properties to Michigan Broadcasting Company. Although this would mean that my client would realize all of his capital gain in the year 1957, we are willing to consider changes in the contract along these lines if the then required cooperation of Grant F. Ashbacker and wife respecting the assignment of the leases can be obtained. Mr. Shawd has been endeavoring to contact Mr. Ashbacker and will report as soon as possible respecting his attitude on the matter."

Over the same week end, and as indicated in Landman's quoted letter, one of plaintiff's negotiating representatives forwarded to Landman "some hurriedly scribbled notes" termed (by plaintiff) "a suggested method of purchase of WKBZ." The general purport of these "scribbled notes" was that "the physical assets would be purchased rather than the stock." Plaintiff claims that these notes amounted to "only a suggestion;" that they did not alter the agreement as allegedly made, and that it, plaintiff, at all times was "perfectly willing and ready to sign the necessary papers" as prepared by Landman. Defendant, of course, variantly views the "scribbled notes."

Nothing of further moment transpired (between the parties) until the last day of the year (1956), at which time plaintiff's attorney learned from defendant's attorney that defendant had decided against dealing with plaintiff and had sold his stock "to persons from Washington."

The foregoing proof is opposed in important respects by testimony of defendant and attorney Landman. The substance of their testimony is that the parties at no time agreed on all of the details necessary to effect a sale of the subject stock or the physical assets of the corporation. As to the material proof of which defendant relies, present quotation from the chancellor's opinion will place the essence thereof before the reader.

Of events transpiring at the pivotal meeting of the parties, and immediately thereafter, the chancellor with full evidentiary support found as follows:

"At the meeting of December 13th, the matter of the purchase of this stock was quite thoroughly gone into, and defendant's counsel prepared the contract which is attached to the bill of complaint. His letter of transmittal of this contract to the plaintiff was written after Mr. Holmes had forwarded to him his proposal of a different contract. The letter of transmittal closes with the following remarks:

" 'Mr. Holmes suggested the possibility of a meeting tomorrow but is being advised by Mr. Shawd that I can not be available at that time. Perhaps we can arrange a conference for Wednesday or Thursday if that is convenient for all concerned.'

"Both defendant and his attorney testified in this case that the contract prepared was merely a proposed draft, and I might say that it is referred to in the letter of transmittal as 'a draft of the proposed contract'. They also testified that the parties contemplated future meetings and discussions in order to arrive at a formal determination of the terms of this sale. This wording of the letter signed by Mr. Landman, defendant's attorney, certainly seems to bear out that contention. Also, the letter of Mr. Holmes transmitting to Mr. Landman his counterproposal as to the method of purchase of the stock reads as follows:

" 'Here are some rough notes of our purchase of WKBZ from Mr. Arch Shawd.

" 'If you have any questions please call me at WO–47191.

" 'We can come up Tuesday, if papers can be drawn up.

" 'Our tax man—David Sutherland, 501 Security Nat. Bank Bldg. Phone WO–23431.

" 'Enclosed WBCM copy of a note. Could be used in purchase.

" 'We believe the methods of purchase involved are much better for Mr. Shawd and also for Michigan Broadcasting Co.'

"This letter also would indicate that the parties at least had in mind further meetings and negotiations before the execution of any final contract.

"The decision of this phase of the case requires a determination of what the real intent of these parties was at the time they closed their meeting on December 13th, because at that time they either had a complete contract or they didn't. It seems to me significant that when this proposed draft of the contract was received by the plaintiff, it did not execute the contract and mail it back to Mr. Landman as it certainly would have done had it been its definite understanding that the contract was completed. On the contrary, the proposed contract was retained in Battle Creek, a counterproposal was made, and the claim that it was final and binding did not arise until the discovery of the fact that the defendant had negotiated a sale with someone else."

With respect to what defendant contends is evidence of continued and unsettled negotiations (referring here to the "scribbled notes"), the chancellor said:

"On December 16, 1956, it appears that David Holmes, an officer of the plaintiff, prepared a paper himself setting forth the terms of a proposed contract which he in turn forwarded to defendant's attorney for consideration. The form of contract for-

warded to the plaintiff by defendant's attorney was never executed by the plaintiff, and about 2 weeks having elapsed after the receipt of the contract by the plaintiff, the testimony indicates that the plaintiff discovered that the defendant had entered into an agreement to sell the stock of the corporation to someone else, and thereupon this suit was commenced."

We conclude that the chancellor was justified in finding no enforceable agreement between the parties. The negotiations were complex, as were the necessitous requirements of attaining the goal of such negotiations. A written agreement was proposed, referred to and suggested as the parties talked and a draft was ultimately ordered and prepared. The involved value and amount was something out of the ordinary, and the agreement toward which the parties were proceeding was "of that class which are usually found to be in writing." While these factors are by no means conclusive,* they unitedly stand as "some evidence that the parties intended it (a writing) to be the final closing of the contract" (quotation from *McConnell, supra*). Consequently such factors fairly support the chancellor's decree.

As in *Peek* our stated conclusion renders it unnecessary that consideration be given to the question whether "the agreement counted on, though for a sale and purchase of stock, was within the statute of frauds." It also eliminates need for examination of defendant's claim, planted on *Jacob v. Gratiot Central Market Co.,* 267 Mich 262, that plaintiff

* See 1 Willison on Contracts (3d ed), §§ 28 and 28A, and the successive annotations headed "Formal or written instrument as essential to completed contract where the making of such instrument is contemplated by parties to verbal or informal agreement." (122 ALR 1217; 165 ALR 756.)

failed to prove (plaintiff being a corporation) that the alleged contract was mutually obligatory.
Affirmed. Costs to defendant.

DETHMERS, C. J., and CARR, KELLY, SMITH, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred.