JACK BAKER, INC., Appellant,

v.

OFFICE SPACE DEVELOPMENT CORPORATION, Appellee.

No. 93–CV–188.

District of Columbia Court of Appeals.

Argued Jan. 31, 1995.

Decided Sept. 25, 1995.

Lawrence C. Melton, Washington, DC, for appellant.

Louis P. Robbins, Washington, DC, for appellee.

Before FERREN, TERRY and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

Jack Baker, Inc. ("JBI") appeals from a grant of summary judgment in favor of Office Space Development Corporation ("OSDC") in a breach of contract action brought by JBI in connection with a building project for the new Philippine Embassy. JBI principally argues that the trial court erred when it concluded that the oral negotiations between JBI and OSDC could not be found to have resulted in an enforceable oral contract. We affirm.

## I.

This controversy arises out of the construction of a new Philippine Embassy building in the District of Columbia. OSDC had been hired by the Embassy to oversee the construction of the new building.[1] In a letter dated December 20, 1990, which OSDC sent to various potential subcontractors including JBI, OSDC announced that "[t]he Philippine Embassy is in the process of selecting subcontractors for the construction of the New Philippine Embassy Building." The letter stated that OSDC was working "in collaboration with the Chairman of the Embassy Building Committee and the project architect." The letter also outlined a highly formal three-phase selection process and provided that "[t]he final selection of any subcontractor will be subject to the approval of the Philippine Department of Foreign Affairs (DFA)." Bids were submitted by JBI, the John Driggs Company ("Driggs"), and Abernathy Excavation, Inc. ("Abernathy"), for excavation work on the building site.

On June 19, 1991, Jesus Almario (the president of OSDC) and representatives from JBI met to discuss JBI's bid.[2] The parties are in disagreement as to the significance of this meeting. The Chief Estimator for JBI, Christopher Ertz, stated in his deposition that after JBI agreed to lower its price, "Mr. Baker shook hands with Mr. Almario and we considered that we had a firm contract to perform the work." However, Ertz admitted that the subcontract was still subject to the approval of the Embassy. According to Almario's version of the meeting, Almario told JBI's representatives that if they lowered its price (as they did), he would recommend JBI to the Embassy for approval.

On June 21, 1991, Almario sent a letter to the Embassy's building committee, requesting its "approval of the above recommendation to negotiate the sitework [and] excavation portion of the Project first with Jack Baker, Inc." This letter is dated June 21, 1991, and has signatures from the committee members dating from June 26 to July 16.[3] In his affidavit, Almario indicated that this

---

1. The parties are in disagreement as to what OSDC's exact role was in connection with the construction of the new building. JBI asserts that OSDC was the general contractor for the construction job. OSDC maintains that it was to "provide consulting services" and "project management services," and acted as a disclosed agent for the Embassy. Given our holding, we need not decide this issue.

2. Initially, Driggs had submitted the lowest bid, and Almario had requested permission from the Embassy building committee to reduce the competition to Driggs and the second lowest bidder, Abernathy. However, in June of 1991, the *Washington Post* published an article questioning the financial well-being of Driggs. OSDC then decided to continue to negotiate with JBI.

3. It appears that as of July 1, a majority of the members had signed the letter.

authorization meant that negotiations were to take place with JBI and that "in the event agreement could not be reached with Jack Baker, Inc.," negotiations were to take place with Abernathy. However, in his deposition, Almario acknowledged that in this letter he was "requesting permission from the Embassy Committee to go ahead and make the award to [JBI]." He acknowledged that once the letter had been signed by a majority of the members, the letter "[a]uthoriz[ed] [him] to go forward." [4]

On July 5, 1991, OSDC sent a letter to Driggs and Abernathy, informing them that "the decision was made to award the excavation phase of the Project to [JBI]." Almario sent an elaborate ten-page form contract to JBI on July 9, 1991. On July 24, 1991, almost three weeks later, JBI faxed to OSDC a copy of the form contract which reflected several changes.[5] These changes included scope of work exclusions,[6] which JBI indicated—in an added contract term—were "an integral part of this agreement."

On August 6, 1991, one of JBI's employees noticed that Abernathy was performing excavation work at the Embassy. Shortly thereafter, JBI received a letter from OSDC dated August 5, 1991, indicating that the job had been awarded to the second lowest contractor, Abernathy.

JBI then instituted the present suit in the Superior Court, alleging breach of contract, promissory estoppel, and fraud. OSDC moved for summary judgment, principally on the basis that no written contract had ever been agreed to. JBI now appeals from the trial court's grant of that motion.

## II.

 Since JBI's alleged breach of contract rights must depend upon its proof of an enforceable oral agreement, we first turn to an examination of the relevant law on that issue. Under D.C. law, as is generally true,

"[f]or an enforceable contract to exist, there must be both (1) agreement as to all material terms; and (2) intention of the parties to be bound." *Georgetown Entertainment Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985). Absent any contrary requirement under a statute of frauds, parties may enter into enforceable oral contracts, as long as they agree to all material terms and intend to be bound by their oral agreement. *See, e.g., Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 547 (D.C.1981).

Even if the parties intend to subsequently enter into a written contract, as was indisputably the case here, it does not necessarily follow that they have not made any contract until the writing is completed and signed. The parties may be bound by their oral agreement if it meets the dual requirements of intent and completeness. *See, e.g., Thompson v. Pike*, 122 Idaho 690, 838 P.2d 293, 299 (1992); *Juliano v. Angelini*, 708 P.2d 1289, 1291 (Alaska 1985); *see generally* 1 ARTHUR L. CORBIN, CORBIN ON CONTRACTS §§ 2.8, 2.9 (1993).

 However, the party asserting the existence of a contract has the burden of proof on that issue. *See Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc.*, 206 A.D.2d 166, 619 N.Y.S.2d 260, 263 (N.Y.App. Div.1994) ("The party seeking to enforce a contract bears the burden to establish that a binding agreement was made and to prove the terms of the contract."); *Thompson, supra*, 838 P.2d at 299 ("The burden of proof is on the party asserting that the contract was binding before the written draft was signed."); *see also* CORBIN, *supra* § 2.9 at 159. Where the parties contemplate a subsequent written contract, this burden is particularly onerous. As we summarized the "well-settled" state of the law in *D.C. Area Community Council v. Jackson*, 385 A.2d 185 (D.C.1978) (per curiam):

---

4. The Philippine Department of Foreign Affairs functioned through a building committee consisting of a Chairman, the Deputy Chief of Mission, and six other Embassy officials.

5. These changes involved eliminating or qualifying some of the twenty-nine items listed in the

"Work of the subcontract" section of the proposed agreement.

6. These twenty-three exclusions covered, among other things, details regarding the excavation process.

[P]arties [may] make an enforceable contract binding them to prepare and execute a subsequent documentary agreement. In order that such may be the effect, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. That document is understood to be a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called "contract" to make a contract is not a contract at all.

Id. at 187 (quoting 1 A. CORBIN, CONTRACTS § 29 (1963)). Unless, then, a party claiming breach of an oral contract can show that the contemplated written document is to be "a mere memorial of the agreement already reached," it cannot prevail.

■ With respect to proof of intent, this court held in *Edmund J. Flynn Co., supra*, in determining whether the parties have entered a contract, the parties' intention to be bound must be "closely" examined:

In evaluating contract formation, we also look closely at the parties' intention to be bound. In order to form a binding agreement, both parties must have the distinct intention to be bound; without such intent, there can be no assent and therefore no contract.

431 A.2d at 547. The court further noted: "[i]ndeed, the subsequent negotiations about drafts of a written sales commission agreement reflect the parties' intention not to be bound until a formal writing was executed." *Id.* Accordingly, parties will not be bound to a preliminary agreement unless the evidence presented clearly indicates that they intended to be bound at that point. *See Simplicio v. National Scientific Personnel Bureau, Inc.*, 180 A.2d 500, 502 (D.C.1962) ("[t]he language of the letter, taken as a whole, clearly indicates that the appellant did not intend to be bound [by the agreement] until a written agreement had been signed by both sides"); *see also Rosenthal v. National Produce Co.*, 573 A.2d 365, 369 n. 9 (D.C.1990) ("whether oral representations constitute a contract is [a question] of law").

■ But intent alone is not enough. Where the parties fail to agree to all material terms, no contract is formed, *see Georgetown Entertainment, supra*, 496 A.2d at 590 n. 2, even if the parties intended to be bound by their oral agreement prior to the execution of the written contract. *See Opdyke Inv. Co. v. Norris Grain Co.*, 413 Mich. 354, 320 N.W.2d 836, 838 (1982) ("A contract to make a contract can fail for indefiniteness if the trier of fact finds that it does not include an essential term to be incorporated into the final contract."); *see also D.C. Area Community Council, supra*, 385 A.2d at 188.

This court has, in several cases, found agreements to be unenforceable because the parties failed to agree to all material terms. In *Stansel v. American Sec. Bank*, the court rejected a claim that an enforceable oral agreement concerning a loan existed, holding that the parties failed to "offer[ ] evidence of any specific terms of the alleged agreement, such as the exact amount of the loans, the interest rates, terms of payment, or manner of performance." 547 A.2d 990, 993 (D.C. 1988), *cert. denied*, 490 U.S. 1021, 109 S.Ct. 1746, 104 L.Ed.2d 183 (1989). Accordingly, the court held that the "claim of breach of contract fails for lack of certainty of the contract's terms." *Id.; see also Owen v. Owen*, 427 A.2d 933, 938 (D.C.1981) ("To be final, a contract must extend to all the terms the parties intend to introduce, and material terms cannot be left for future settlement." (internal quotation marks omitted)).

In *Edmund J. Flynn Co., supra*, the court found that there was no enforceable sales commission contract "because there was never any agreement on the material terms of compensation and termination." 431 A.2d at 547 (footnote omitted). And in *Rosenthal, supra*, the court found that a contract between a produce supplier and a restaurant was unenforceable because "[t]here was no stated agreement as to price, quantity, quality, or duration." 573 A.2d at 370 ("Reasonable definiteness in the essential terms of a purported contract must ... be a precondition for its enforceability, for otherwise the court has no adequate means of identifying the obligations which it should enforce."); *see also Heritage Broadcasting Co. v. Wilson*

*Communications, Inc.,* 170 Mich.App. 812, 428 N.W.2d 784, 787 (Ct.App.1988) ("To be enforceable, a contract to enter into a future contract must specify all its material and essential terms and leave none to be agreed upon."); CORBIN, *supra* § 2.8, at 131 ("As long as the parties know that there is an essential term not yet agreed on, there is no contract.").

Courts in other jurisdictions have applied this principle of definiteness in the specific context of construction contracts. *See Savoca Masonry Co. v. Homes & Son Constr. Co.,* 112 Ariz. 392, 542 P.2d 817, 820 (1975) (no oral contract resulted when defendant told plaintiff that its bid was accepted because only the price and work involved were agreed upon); *C.H. Leavell & Co. v. Grafe & Assocs.,* 90 Idaho 502, 414 P.2d 873, 877 (1966) (no contract formed when alleged oral agreement failed to address essential terms, including the performance bond and scope of work).

The Supreme Court of Idaho has articulated a five-part test that we think useful to determine whether an oral agreement in contemplation of a written contract is enforceable:

> (1) whether the contract is one usually put in writing, (2) whether there are few or many details, (3) whether the amount involved is large or small, (4) whether it requires a formal writing for a full expression of the covenants and promises, and (5) whether the negotiations indicate that a written draft is contemplated as the final conclusion of negotiations.

*Thompson, supra,* 838 P.2d at 299; *see also Mississippi & Dominion Steamship Co. v. Swift,* 86 Me. 248, 29 A. 1063, 1067 (1894) (listing similar factors); *Michigan Broadcasting Co. v. Shawd,* 352 Mich. 453, 90 N.W.2d 451, 456 (1958) (en banc) (same). The Second Circuit, in applying a similar test, has held that summary judgment was properly granted where the evidence on these factors was "overwhelmingly in favor of one position." *See R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) ("the present case is one in which it was convincingly demonstrated that the suit could have only one outcome").

We turn now to the application of these principles to the case before us.

### III.

■■■ We apply here the familiar principles governing summary judgment motions. Summary judgment is properly granted "only if there are no genuine issues of material fact in dispute and if the moving party is entitled to judgment as a matter of law." *Galloway v. Safeway Stores, Inc.,* 632 A.2d 736, 738 (D.C.1993). We consider the evidence in the light most favorable to the nonmoving party, and conduct an independent review of the record. *West End Tenants Ass'n v. George Washington Univ.,* 640 A.2d 718, 725 (D.C.1994). However, summary judgment will lie unless the dispute about a material fact is "genuine"; "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *see also Nader v. de Toledano,* 408 A.2d 31, 41–42 (D.C.1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980).

In order to survive a motion for summary judgment on the breach of contract claim, JBI was required to put forth sufficient evidence to meet the *Anderson* test on both of the elements of its prima facie case—intention to be bound and agreement to all material terms. We agree with the trial court that it failed to do so.

■■■ As the trial court pointed out, the entire aura of this transaction was one of formality. The award was to be made in a carefully spelled out three-step process. It was a major project, involving a considerable amount of money. A sovereign foreign government was a key player. It would be difficult indeed for an oral agreement alone to set forth all the material, detailed terms and conditions governing the reciprocal obligations of the parties for this kind of project. It was unquestioned that a written contract was contemplated as part of the transaction.

One further factor here sets this case apart from typical litigation alleging an oral

agreement; namely, that both parties were well aware that the Embassy had not yet approved of the selection of JBI as the subcontractor, and therefore Almario had no authority to finally award the contract to JBI. It is true that, several weeks after the June 19 meeting, Almario received the Building Committee's approval "to negotiate the sitework [and] excavation portion of the project first with Jack Baker, Inc." Almario's own testimony indicated that in his view, this did in fact give him final approval to award the contract to JBI. However, the letter itself indicates that it was not, in the Embassy building committee's view, self-executing as approval, but rather that some further step in "negotiations" was contemplated. The more significant point is that, while it might not be theoretically impossible for parties to orally agree to a binding contract subject only to the approval of some third party, this further significant element of non-finality is a striking addition to a context already markedly inhospitable to a binding oral agreement.

Additionally, even if the discussions of June 19 could be reasonably viewed as an oral agreement which was to become binding once the Embassy had approved the selection of JBI, we find it difficult to see how the subsequent written agreement could be found to be simply "a mere memorial of the [oral] agreement already reached," as required by *D.C. Area Community Council, supra*, 385 A.2d at 185. The form contract sent to JBI by OSDC was a complex document—which included sixteen articles and was ten pages long. While in many respects the form was a standard contract, some few articles contained typed-in provisions especially relating to this project, and the scope of work and payment schedule were separate attachments, drafted especially for this project. JBI took almost three weeks before responding to the agreement sent it by OSDC, hardly treating it as a "mere memorial." JBI made several changes to the scope of work on the proposed contract and submitted a separate list of over twenty scope of work exclusions,[7] which JBI itself asserted were "an integral part of this agreement."

In sum, considering the factors articulated in *Thompson, supra*, 838 P.2d at 299, in the context of the record before us, we must deem them to be "overwhelmingly in favor of one position," warranting the grant of summary judgment. *R.G. Group, Inc., supra*, 751 F.2d at 77.[8] Based on the record before us and the applicable legal doctrines, we agree with the trial court that no reasonable fact-finder could conclude that an enforceable oral agreement existed between JBI and OSDC.[9]

*Affirmed.*

---

7. JBI asserts that these scope of work provisions were no different than those contained in its last bid to OSDC, but the record does not indicate that JBI considered these changes to be purely clerical or communicated this view to OSDC.

8. As in *Haughton Elevator Co. v. Donata Corp.*, "[b]oth of these parties are very experienced in the construction field. Either could have had a completed contract for the work in question had either wanted a binding contract." 271 F.Supp. 958, 960 (E.D.Va.1966), *aff'd*, 381 F.2d 737 (4th Cir.1967).

9. JBI also asserts that the trial court erred in its grant of summary judgment on the counts of promissory estoppel and fraud. The same difficulties facing JBI with respect to proof of an oral agreement preclude any successful showing of promissory estoppel under the requirements of *Bender v. Design Store Corp.*, 404 A.2d 194 (D.C. 1979). With respect to the fraud claim (termed "bad faith" on appeal), JBI's arguments raised below focused on the "ulterior motives for breaching the agreement of June 19, 1991." In light of our holding that there was no "agreement," this claim must fail as well.