Dennis MALONE, Appellant,

v.

SAXONY COOPERATIVE
APARTMENTS, INC.
et al., Appellees.

No. 98–CV–1276.

District of Columbia Court of Appeals.

Argued Nov. 10, 1999.
Decided Dec. 14, 2000.

Thomas C. Mugavero, for appellees.

Before FARRELL, RUIZ, and WASHINGTON, Associate Judges.

WASHINGTON, Associate Judge:

Dennis Malone appeals the trial court's grant of summary judgment in favor of Saxony Cooperative Apartments, Inc., *et al.* (Saxony) in a breach of contract cause of action for the sale of a proprietary lease by Saxony to Malone. The trial court ruled that no enforceable contract for the sale of an apartment unit existed between Malone and Saxony. Malone submitted a timely appeal to this court arguing primarily that the trial court erred in reaching that decision.[1] We affirm.

## I. FACTUAL SUMMARY

Saxony is a cooperative that owns a high-rise building located at 1801 Clydesdale Place, N.W. in Washington, D.C. The

---

1. Additionally, Malone alleges that the directors of Saxony were negligent and breached their fiduciary duty to him, as a shareholder, and are individually liable for their negligence. However, Malone does not have standing to bring such a claim directly. Malone's claim is for injuries sustained to the cooperative, and such a claim can only be brought in the form of an indirect derivative suit on behalf on the cooperative. *See* Super.Ct.Civ.R. 23.1; *Bazata v. National Ins. Co.*, 400 A.2d 313, 316 (D.C.1979).

shareholders lease their apartment units pursuant to a proprietary lease. Malone has resided in the high-rise complex, in unit 420, since 1990.[2]

On December 15, 1993, the Board of Directors terminated a proprietary lease to Joseph Miles, who resided in unit 421. In March of 1994, a bid was made to purchase the proprietary lease for unit 421 by Clayton Scott. However, without further mention of Scott's prior offer, the minutes of the Board's meeting of April 27, 1994 reflect that an offer of $19,700.00 was made by appellant, Dennis Malone, to purchase the proprietary lease for the same unit. Malone proffers that his offer was presented to the Board in written form and provided all the terms necessary to form a binding agreement. The substance of the letter is as follows:

> I would like to propose to the Board that I be allowed to purchase unit number 421 for the sum of $19,700. As you know, this unit has been on the market for over nine months and has not sold. During this time the Saxony has not received payments and the unit is in substantial arrearage. The unit itself is in very poor condition. If the unit is not sold soon the Saxony will be forced to renovate and market this unit—taking an undisclosed amount of time as the arrearage grows. I pledge to merge these two units 421 and 420 into one using Board financing at the rate of one interest point above current ncb rates for new loans in this building, closing costs to be paid by the seller and settlement to occur within 30 days of Board approval.

In response to Malone's offer, the Board passed a unanimous motion "to accept if the units ar[e] to be merged within thirty days after settlement." Malone's letter and the language from the Board minutes constitute the entirety of the writings between the two parties.

Malone asserts that he contacted the managing agent for the Saxony Cooperative within two weeks of the Board meeting to arrange for settlement on the unit. According to Malone, he was told that the unit was in probate and, therefore, settlement could not occur at that time.

In May, the Board voted to place a hold on Malone's bid because Scott had renewed his offer to purchase the unit for $20,000. Scott, however, never closed on the unit and it remained vacant. There is no indication in the record that the Board had any further discussions with Malone during this time period. One year later, in April 1995, the Board accepted an offer for $25,000 from another prospective purchaser, but that sale also never materialized. After this attempt failed to sell the unit, Saxony adopted a more aggressive sales approach, contracting with Weichert Realtors to market its vacant units. As part of this effort to more aggressively market its available apartment units, unit 421 was renovated as a model unit. Despite living next door to unit 421, Malone did not seek to speak with the Board regarding the renovations until sometime during the last quarter of 1996, after the renovations were complete. According to Malone, he didn't have an opportunity to speak with the Board about his concerns at that time because he was out of town when the Board last met in 1996. Malone, however, did attend a Saxony Board meeting in February of 1997, to express his concerns regarding Saxony's renovations of unit 421 and its impact on his contract to purchase the lease. At that time, Malone alleges that he first learned that the Board was attempting to sell the unit.

Malone sent the Board a letter requesting $5,000 to release Saxony from his claims of breach of contract and breach of fiduciary duty. Saxony replied that no contract existed between Saxony and Malone for the sale of the unit and that he was not entitled to damages. Malone in-

---

**2.** Malone served on the Board of Directors of Saxony apartment complex from 1990 until March 1994. He also served as President of the Board in December of 1993.

stituted this law suit against Saxony on October 20, 1997, for breach of the contract.

## II. STANDARD OF REVIEW

The disposition of this case on appeal is governed by the oft-repeated standard of review for a grant of summary judgment. We review the grant or denial of a summary judgment motion *de novo*. *See Walton v. District of Columbia*, 670 A.2d 1346, 1353 (D.C.1996). "We consider the evidence in the light most favorable to the nonmoving party, and conduct an independent review of the record." *Baker v. Office Space Dev. Corp.*, 664 A.2d 1236, 1240 (D.C.1995) (citation omitted). "Summary judgment is properly granted 'only if there are no genuine issues of material fact in dispute and if the moving party is entitled to judgment as a matter of law.'" *Id.* (citation omitted). "However, summary judgment will lie unless the dispute about a material fact is 'genuine'; 'there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Id.* (citations omitted).

## III. ANALYSIS

Malone contends that the trial court erred in ruling, as a matter of law, that he did not enter into a valid and binding contract with Saxony for the purchase of the proprietary lease for unit 421. In support of his contention, Malone offers two arguments. First, he argues that a binding contract was formed when his offer to purchase the proprietary lease for unit 421 was accepted by Saxony on April 27, 1994.

Despite Malone's argument that his offer to purchase unit 421 was accepted by Saxony during its board meeting on April 27, 1994, Saxony's response to Malone's offer which was conditioned on a promise from Malone to merge unit 421 with his unit within 30 days after settlement was not an acceptance at all but constituted a counteroffer. The law is well settled that a statement purporting to accept an offer which contains a new material term operates as a counteroffer and must be accepted by the original offeror in order to form a binding contract. *See Dunn v. Shane*, 195 A.2d 409, 410–11 (D.C.1963). While Malone's original offer expressed an intent to merge the two apartments into one, Saxony conditioned its acceptance of the proposal on the job being finished within the relatively brief span of thirty days. That qualification, which clearly imposed a significant burden on Malone, constituted a counteroffer for the sale of the proprietary lease and called for Malone's acceptance in order to form a binding contract. Thus, no contract was formed by Saxony's actions on April 27, 1994, because there was no valid acceptance of Malone's offer.

Indeed, to form a contract the offeree must convey to the offeror his acceptance of the offer. Malone concedes that there is no writing that evinces his acceptance of Saxony's counteroffer, however, he contends on appeal that he accepted Saxony's counteroffer when he contacted Saxony's management agent to inquire about a closing date for the transaction. In support of this contention, Malone points to the affidavit he submitted to the trial court that alleges he contacted Saxony's management agent after the April 27th meeting and indicated his willingness to go forward with the settlement.[3] Es-

3. Despite Malone's assertion at oral argument that he orally accepted Saxony's counteroffer, Malone's affidavit states only that he approached Saxony's management to go to settlement. Malone's affidavit, the only offer of proof in the record, does not state that he verbally informed the management agent that he accepted the terms of the counteroffer or that he in fact agreed to merge the units within thirty days of settlement. Thus, we explore only Malone's argument that he accepted the counteroffer when he inquired about the settlement date. We do not consider other theories of law, such as the doctrine of partial performance, which might permit the enforceability of an oral contract other-

sentially, Malone contends that contacting Saxony to indicate his desire to go to settlement was sufficient to accept Saxony's counteroffer.

In support of his argument that his conduct was sufficient to accept Saxony's counteroffer, Malone proffers one case, *Tracy v. Disman*, 137 A.2d 217 (D.C.1957). Although *Tracy*, like the present case, involved the sale of real estate, the similarities between the two cases end at that point. In *Tracy*, an offer was made to purchase a home. As consideration for the offer, the purchasers tendered $250.00 in earnest money. The seller, although pleased with the terms of the offer, felt that the amount of earnest money tendered was insufficient. Therefore, he executed the agreement indicating his acceptance of the offer, but directed his agent not to deliver the agreement to the purchasers unless they doubled to $500.00 the amount of earnest money deposited in consideration for the contract. The purchasers subsequently tendered the additional money.

The issue in that case was not whether a binding contract had been formed but when. We held that the request for additional earnest money was a counteroffer and that only when the full $500.00 deposit was tendered did a contract come into existence between the two parties. *See id* at 219. We determined that the very terms of the counteroffer called for an acceptance by performance, that performance being the deposit of an additional $250.00. Upon the purchasers satisfying that obligation, we held a contract was formed.

■ Malone contends that by contacting Saxony's management agent to seek a settlement date, he like the purchasers in *Tracy*, indicated his acceptance of the

counteroffer. However, it is the offeror who determines the manner of acceptance. *See Flack v. Laster*, 417 A.2d 393, 401 (D.C.1980). In *Tracy*, by tendering the earnest money requested by the seller, the purchasers unequivocally assented to the seller's counteroffer, thus forming a valid contract. In the present case, Malone's conduct does not in any way indicate his unequivocal assent to the condition in Saxony's counteroffer that the units be merged within thirty days of settlement.

■ For there to be an enforceable contract, there must be mutual assent of each party to all the essential terms of the contract. *See Baker*, 664 A.2d at 1238 (commenting that under D.C. law " '[f]or an enforceable contract to exist, there must be ... agreement as to all material terms' ") (quoting *Georgetown Entertainment Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C.1985)). " '[A]s long as the parties know that there is an essential term not yet agreed on, there is no contract.' " *Id.* at 1240 (quoting 1 A. CORBIN, CONTRACTS § 2.8, at 131 (1963)). " 'One of the essential elements for formation of a contract ... is a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words to establish a contract the minds of the parties must be in agreement as to its terms.' " *Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995) (citation omitted).

■ This mutuality of assent is often referred to as a "meeting of the minds." *See id.* "The failure to agree on or even discuss an essential term of a contract may indicate that the mutual assent required to make or modify a contract is lacking." *Owen v. Owen*, 427 A.2d 933, 937 (D.C. 1981) (citations omitted). *See also Georgetown Entertainment Corp.*, 496 A.2d at 590 n. 2 (expressing that "[i]f the docu-

wise barred by the statute of frauds. *See Hackney v. Morelite Constr.*, 418 A.2d 1062, 1066 (D.C.1980). In any event, other jurisdictions have noted that the doctrine of partial performance is not satisfied by conduct that amounts to merely preliminary activities

taken in anticipation of the conveyance of an interest in land, such as in this case. *See F.D.I.C. v. Altholtz*, 4 F.Supp.2d 80, 86 (D.Conn.1998); *Weale v. Massachusetts Gen. Hous. Corp.*, 117 N.H. 428, 374 A.2d 925, 928 (1977).

ment or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made") (citations omitted); *Edmund v. Schlosser,* 265 A.2d 599, 601 (D.C. 1970) (noting that "[i]f no mutual agreement is ever reached, there is no contract").

Saxony's insistence that the units be merged within thirty days of settlement was a material term which required an acceptance in the form of a promise of performance in order to form a binding contract. Thus, in light of Malone's failure to communicate to Saxony his agreement to merge the units within thirty days of settlement, a material term of the contract was not assented to by both parties, and no contract can be said to have been formed. "[T]he party asserting the existence of a contract has the burden of proof on that issue." *Baker,* 664 A.2d at 1238 (citations omitted). Without a communication indicating that Malone agreed to Saxony's additional material demand that the units be merged within thirty days of settlement, we cannot say that there was a meeting of the minds between the two parties necessary to form an enforceable contract.

Accordingly, the judgment of the Superior Court is

*Affirmed.*