NEW ECONOMY CAPITAL,
LLC, Appellant,

v.

NEW MARKETS CAPITAL GROUP,
et al., Appellees.

No. 04–CV–233.

District of Columbia Court of Appeals.

Argued June 16, 2005.

Decided Aug. 11, 2005.

Pamela J. Bethel, with whom Jonathan T. Williams, Washington, DC, was on the brief, for appellant.

Angela Givens, with whom Steven G. Reade, Washington, DC, was on the brief, for appellees.

Before SCHWELB and REID, Associate Judges, and BELSON, Senior Judge.

REID, Associate Judge:

The issue in this case, which involves a civil complaint by appellant New Economy Capital, LLC ("NEC") against appellees New Markets Capital Group ("NMCG"), Milicent Hodge, and Alan D. Wheat, is whether the trial court properly granted summary judgment in favor of appellees.

NEC contends that the trial court's order granting summary judgment was improper, mainly because there are genuine issues of material fact. We affirm the trial court's order insofar as it grants judgment as a matter of law on NEC's "breach of promise" and breach of oral contract claims, including those against Ms. Hodge and Mr. Wheat in their individual capacities. However, we reverse the order as it relates to NEC's quantum meruit claim against NMCG and remand the case to the trial court for further proceedings with respect to that claim.

## FACTUAL SUMMARY

Janice Booker, President and manager of NEC, a District of Columbia limited liability company, filed a first amended complaint in December 2002, against defendants NMCG, a Delaware limited liability company which transacted business in the District, and Mr. Wheat and Ms. Hodge in their individual and corporate capacities. NEC's complaint contained three counts: Count I, breach of promise,

Count II, breach of oral contract, and Count III, quantum meruit. As relief, NEC demanded $241,000.00 relating to consulting services; no demand pertaining to fundraising work was made.

Ms. Booker alleged that she "provided substantial consulting and fundraising services to [appellees] . . . in connection with a private equity fund called the New Markets Equity Fund" whose general partner is NMCG. No written contract was executed for these alleged services, but Ms. Booker claimed that Mr. Wheat and Ms. Hodge, both partners and managing members of NMCG, orally promised compensation for her services. In her deposition testimony of June 20, 2003, however, Ms. Booker ultimately testified that she discussed compensation only with Ms. Hodge. Ms. Booker stated that her (NEC's) consulting services would be paid on an hourly basis, but ultimately acknowledged that no written or oral agreement was reached concerning the amount of the hourly fee, even though she claimed $150.00 per hour for her consulting services.[1] During Ms.

---

1. Although Ms. Booker drafted and submitted contracts for consulting services and fundraising services, neither type was executed in writing. Following is a pertinent part of Ms. Booker's deposition which demonstrates that no agreement was reached as to terms:

Q. Okay. What was the agreement that was reached with regard to the compensation that you said Ms. Hodge said they agreed to?
A. That we would have consulting services on an hourly rate. I had recommended what that would be. And she was to get back to me regarding what the final number would be. There would also be the schedule with break points for the actual commission raised.
Q. So the decision was reached that there would be an hourly fee?
A. Yes.
Q. Not a fixed fee?
A. Not a fixed fee but an hourly rate.
Q. Okay. And you don't remember what that number was?

A. It was being negotiated. And I gave you the numbers as I—- the best I recall at this time . . . .
Q. You said the hourly rate was still left open, if I understood you correctly.
A. Right.
Q. Before you joined New Market[s] Equity Fund?
A. Uh-huh.
Q. So was it your understanding that that hourly rate was going to be determined at some time later?
A. It was—- it was my— yes.
Q. That was your understanding?
A. Yes.
Q. But there was no agreement as to the hourly rate?
A. It was discussed. But the same as the payment schedule, it had not been settled, meaning I didn't have it in writing yet in a contract.
Q. I'm just asking what did you agree to on the number. If you said it was—- just

Booker's deposition testimony, a letter of March 24, 2000 from Ms. Hodge to Ms. Booker was introduced which stated: "I am glad that you approached us about working with the NMEF and that we were able to reach an understanding. We look forward to you joining our team as a fundraising consultant on the terms noted below." Below this message was a document titled, "Final Terms—New Markets Equity Fund (Incorporates March terms and October notes...)." In that section, the New Markets Equity Fund ("NMEF") specified its response to Ms. Hodge's proposed payment options:

> Unfortunately, NMEF can not agree to these terms. All compensation packages are connected to capital being raised. As we discussed, all compensation to our fundraiser shall be based on a commission structure to avoid taking on such an obligation as a start-up. This is a deal breaker for us. (3/24/00). Any consulting fees paid to the Consultant shall serve as an advance on any commission that may later become due . . . .
>
> Unfortunately, we can not agree to pay a monthly fixed fee or any other flat fee. In the event that you would like to do such work for us, there must be a mutual agreement, in advance, on an as-needed basis, in a signed writing that limits the cost up-front and that will be paid out of capital raised by you. Un-

less there is such a written agreement, we have agreed that all work perform[ed] by you or your firm is being performed on a commission basis. To date, such work (Public Affairs, Corporate Strategy & Community Affairs), if needed, has been provided by other members of the Fund and/or by a public relations firm. Again, this would have been and still is a deal breaker for us. We want to avoid surprise costs. (10/25).

The NMEF agreed to compensate NEC/Ms. Booker on a "graduated fee structure ... as a percent of the capital contracts originated and closed or closed only by the Consultant." Ms. Booker was asked about the March 24, 2000 document at her deposition. She denied receiving it. She also denied being aware of the above referenced NMEF position as stated in that document.

Ms. Booker worked with the New Markets Equity Fund from March 13, 2000 "through the end of 2001." NEC was paid $5,000.00 in expenses and fees, with a check dated March 27, 2001; the legend on the check stated "commission advance."[2] Thereafter, conflicts arose among the parties concerning compensation. Ms. Booker claimed $65,000.00 in outstanding fees, but her complaint alleges that she received a check in the amount of $20,000.00 from Ms. Hodge in early July 2002 as " 'full and final' payment for consulting services rendered by [NEC] to [NMCG]." Included in

not in writing, what did you agree to as the number?

A. What was under discussion was at $150 an hour or at another level. We had not reached agreement on a number.

Q. So you hadn't reached an agreement?

A. Not on the actual number but rather that it would be paid.

The deposition transcript reveals that as late as November 15–29, 2001, e-mails were being exchanged concerning the proposed contract(s), and that Ms. Booker only worked through the end of 2001.

**2.** Concerning the legend on the check, Ms. Booker stated: "[A]t the bottom of [the check], it says commission advance and expenses and it looks like consultants through 5/01." Counsel for appellees responded: "Do you see the word consultants? I'm trying to see it. I can't read the bottom part of what it says. It says commission advance." Ms. Booker responded: "Okay. That's through 5/01. Yes."

NEC's answers to appellees second set of interrogatories is a response to Interrogatory No. 5(c) which states in part: "Check number 1136 dated June 26, 2002 in the amount of $20,000.00 and noted as the 'Full Settlement Consulting Fee 2000–2002' was received by Plaintiff from Defendant Hodge." That check "was written on the account of [NMCG]...." When Ms. Booker informed Ms. Hodge that the amount was incorrect, Ms. Hodge allegedly stopped payment on the check.

During her 2003 deposition testimony, Ms. Booker claimed that she had put in 1,640 hours in consulting services in behalf of NMCG. She was asked whether she had "detailed records of the time [she] spent doing consulting services." Ms. Booker replied: "From a professional standpoint, you do not keep detailed records but rather you show the results that [have] been performed through providing the advisory services to the client." She "did not keep a time sheet." She reached 1,640 hours by making "a determination of the amount of time [she] had spent working on New Markets."[3] Appellees' first set of interrogatories to NEC contained Interrogatory No. 5 which stated: "Identify each and every consulting service rendered by Plaintiff to Defendants. Identify all documents thereto." NEC/Ms. Booker responded:

The consulting services provided to Defendants include, but are not limited to the following: participating in weekly conference calls, attending team meetings, reviewing and revising sections of the private placement memorandum, development and execution of a "road show" wherein team members made presentations to various investors in several states, provided advice on "public purpose" and Community Reinvestment Act Investments, prepared the submissions to investors, and prepared the Due Diligence Information binders. See

---

3. Ms. Booker's deposition transcript contains the following dialogue:

Q. How would one know the time you spent in consulting services versus the time you spent on fundraising issues?

A. Because you could look at any of the documents that I have provided for you. Many of them have timelines and you can see what these types of services— how much time was being provided. And in many cases the work was in increments of 18–hour days.

Q. Okay. So, if you had a half hour conversation with Ms. Hodge about public affairs, community affairs, corporate strategy, or marketing, and then you did the other 17 and a half hours talking to some big investor to try to get them to contribute to the fund, are you telling me that, at the end of the day, you had 17 and a half hours for fundraising and only a half hour for consulting services?

[Objection]

THE WITNESS: I am telling you that, if you are advising a client on things that can be done in order to market the fund, you don't spend the time writing down every single thing that you've done and the time that's associated with it. But you can determine within blocks of time a really good estimate of how your time is spent.

Q. How do you do that?

A. You look back at the work that was performed over the period of time and make that determination.

Q. Do you look at this on a daily basis and then write down what it is you did for the day? You said you had verbal communications.

A. Verbal communications is one aspect of it. In some cases as I mentioned there were also written documents that were done that would fall into the category of consulting services. What I said to you was that I didn't break it out by the categories that you had requested.

Q. But you have it broken out by the amount of time you spent?

A. I have been able to do a— I think a very accurate estimate of what consisted of the consulting time which I have provided in writing.

Q. You provided it in writing to who?

A. I included that as one of the responses in my interrogatories.

items listed in Answer to Interrogatory 2 for further details.(In addition, various e-mails are being provided in response to Defendant's Request for Production of Documents under Response Number 8 that reflect correspondence and communications regarding Plaintiff's consulting services. See a brief summary on pages 880–881, 2219–2222).[4]

Appellees moved for summary judgment in September 2003. They maintained that under Delaware and District of Columbia law, both Mr. Wheat and Ms. Hodge should be dismissed as defendants because: (1) they were sued based upon their personal guarantee and "an alleged oral, personal guaranty, [is] barred by the District of Columbia Statute of Frauds"; and (2) Mr. Wheat and Ms. Hodge as officers of NMCG "cannot be held liable under applicable law for the contractual obligations of the corporation." With respect to NMCG, appellees asserted that there were no genuine issues of material fact in dispute, and that both appellants' evidence, and their own, establish NMCG's entitlement to summary judgment. Specifically they argued the non-existence of. any enforceable contract between the parties, and a lack of evidence "establish[ing] a claim for *quantum meruit.*" Appellees did not file a separate statement of material facts not in dispute with their motion.[5]

NMCG acknowledged that there was a fundraising agreement between NEC and NMCG, but contended that compensation was to be paid "*solely on a commission*

basis," that is, NEC "would be paid a percentage of the capital that it actually raised for the fund." NMCG disputed, however, the existence of any oral agreement for compensation for consulting services based on an hourly rate or a fixed rate. NMCG also insisted that NEC failed to substantiate its claim that it performed 1,640 hours of consulting services. NMCG relied mainly on Ms. Booker's deposition testimony to support its contentions. It filed no affidavits in behalf of the corporation, Ms. Hodge or Mr. Wheat.[6]

Appellant's opposition to the motion for summary judgment emphasized the existence of genuine issues of material fact. Specifically, NEC argued that: "The central-genuine issue of fact is the Plaintiff alleges in its complaint that it performed substantial consulting work, which was duly accepted by the Defendants, and Plaintiff is thereby entitled to payment." It contrasted its position, that the oral contract was for fundraising and consulting services, with that of NMCG that the agreement was for a commission based on the amount of capital raised. NEC contended that the evidence established the existence of an oral agreement, and that it was not barred by the Statute of Frauds because it "[could] be performed in one year." And, with respect to the individual defendants, "[e]ven where there is a promise to answer for the debt of another, it may be enforceable notwithstanding the Statute of Frauds if the 'leading object' of the promisor was to maintain a direct, personal benefit." As for its quantum me-

---

4. The response to Interrogatory 2 includes references to numerous document pages and sets forth many topics to which those pages are related.

5. Super. Ct. Civ. R. 12–I(k) provides in pertinent part: "[T]here shall be served and filed with each motion for summary judgment pursuant to Rule 56 a statement of the material facts numbered by paragraphs as to which the

moving party contends there is no genuine issue. Each material fact shall be stated in a separate numbered paragraph ...."

6. Super. Ct. Civ. R. 56 provides, in part, that the defending party "may ... move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."

ruit theory, appellant pointed to "the more than 2000 pages of emails between the parties," and declared that appellees would be unjustly enriched if NEC were not compensated for its work.[7] Attached to the opposition was Ms. Booker's October 14, 2003 affidavit regarding the work performed by NEC, as well as a chart showing dates, work performed from March 13, 2000 through December 2001, and number of hours for fundraising (1,825) and consulting services (1,657). During discovery, Ms. Booker claimed an hourly rate of $150.00 for her consulting services.

Appellees filed a motion to strike the exhibit attached to Ms. Booker's affidavit. Among other arguments, appellees claimed that NEC's "actions arguably violate the sham affidavit doctrine, which provides that the court shall disregard an offsetting affidavit that is submitted to withstand a motion for summary judgment when the affidavit contradicts prior deposition testimony and therefore creates only a sham issue of material fact." Neither party sought to strike the other's summary judgment pleading(s) on the ground that no separate statement of material facts as to which there was, or was not, a genuine issue in dispute, had been filed.

The trial court's order of February 5, 2004, granting appellees' motion in favor of all of the appellees stated that: "Defendants' Motion ... is granted for the reasons stated in the Motion." No further explanation was provided. The trial court did not mention appellees' outstanding motion to strike the exhibit to Ms. Booker's affidavit, and hence, there is no ruling as to whether the exhibit falls under the sham affidavit doctrine. NEC filed a timely appeal.

## ANALYSIS

NEC argues that summary judgment was inappropriate because "genuine issues of material fact existed such that the facts on which the Defendants based their request did not entitle them to judgment as a matter of law." NEC also contends that, contrary to the rules of the Superior Court, appellees' motion "failed to identify in separately numbered paragraphs the material facts that the Defendants contended were not in dispute and which entitled them to judgment as a matter of law." NEC maintains that (1) the parties reached agreement on the material terms of the contract; (2) the parties intended to be bound by their oral contract; and (3) even assuming that no enforceable contract exists, the doctrine of promissory estoppel, as asserted by NEC, precluded summary judgment. NEC argues that these contentions embody genuine issues of material fact, and therefore, the trial court's order granting summary judgment to appellees was inappropriate. Furthermore, NEC insists that there is sufficient evidence supporting its quantum meruit claim, and that that claim should not have been disposed of by summary judgment. NEC also asserts that the individual defendants were improperly dismissed because their "promise to pay is an original undertaking, rather than a guaranty of another's debt, [and thus], the promise will not be governed by the Statute of Frauds," and even if it is collateral, the Statute of Frauds still does not present a bar under the " 'leading object' exception to the Statute of Frauds."

Appellees contend that even if there are genuine issues of material fact in dispute,

---

**7.** These referenced e-mails are not included in the record on appeal, although some are discussed in Ms. Booker's deposition testimony. Attached to NEC's reply brief is an affidavit from appellant's trial counsel, dated November 22, 2004, stating that he "turned over 2,000+ pages of Bates-stamped documents."

Mr. Wheat and Ms. Hodge cannot be found liable under any "viable legal theory." They point out that NEC's complaint alleges that "Mr. Wheat acted as a guarantor of the payment at issue," and that even if a promise to personally pay NMCG's debt could be established, this case would not fall within "the leading object exception to the statute of frauds" because no evidence demonstrates that Mr. Wheat and Ms. Hodge would derive direct benefit. As for the corporate plaintiff, NMCG argues that the evidence establishes no enforceable contract for consulting services and that Ms. Booker's deposition testimony establishes just the opposite. In addition, NMCG claims that NEC presented insufficient evidence entitling it to compensation for consulting services on a quantum meruit basis. NMCG insists that the 2,400 pages of records referenced by NEC are not in the record on appeal, and that the "alleged summary of [NEC's] hours is nothing more than an after-the-fact creation, which [NEC] only produced in its opposition to summary judgment and which [appellees] moved to strike in the trial court...." Appellees also state that NEC did not object to the absence of a separate statement of material facts when NMCG lodged its motion for summary judgment in the trial court.

We review orders granting summary judgment *de novo. See Allen v. Yates,* 870 A.2d 39, 44 (D.C.2005). "Summary judgment is properly granted 'only if there are no genuine issues of material fact in dispute and if the moving party is entitled to judgment as a matter of law.'" *Jack Baker, Inc. v. Office Space Dev. Corp.,* 664 A.2d 1236, 1240 (D.C.1995) (quoting *Galloway v. Safeway Stores, Inc.,* 632 A.2d 736, 738 (D.C.1993)); *see also* Super. Ct. Civ. R. 56(c) (Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affida-vits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") "We consider the evidence in the light most favorable to the non-moving party, and conduct an independent review of the record." *Id.* (citation omitted). "[S]ummary judgment will lie unless the dispute about a material fact is 'genuine.'" *Id.* "'[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (other citation omitted)).

■ Furthermore, since NEC's complaint contains claims of "breach of promise," breach of oral contract, and quantum meruit, we review this matter according to prevailing contract principles. "'[F]or an enforceable contract to exist, there must be both (1) agreement as to all material terms; and (2) intention of the parties to be bound.'" *Jack Baker, Inc., supra,* 664 A.2d at 1238 (quoting *Georgetown Entm't Corp. v. District of Columbia,* 496 A.2d 587, 590 (D.C.1985)). That is, the alleged "oral agreement ... [must] meet[] the dual requirements of intent and completeness." *Id.* (citations omitted). The burden of proof in this case is on NEC since it asserts the existence of an oral contract. *Id.* (citation omitted). "Where the parties contemplate a subsequent written contract, this burden is particularly onerous." *Id.* (citation omitted). Thus, "[u]nless ... [NEC] ... can show that the contemplated written document is to be 'a mere memorial of the agreement already reached,' it cannot prevail." *Id.* at 1239.

■ With respect to a quantum meruit theory of recovery, NEC is required to demonstrate the following:

(1) valuable services ... rendered [by Ms. Booker]; (2) for the person sought to be charged [here, NMCG, Ms. Hodge and Mr. Wheat]; (3) which services were accepted by the person sought to be charged, and enjoyed by him or her; and (4) under such circumstances as reasonably notified the person sought to be charged that [NEC], in performing such services, expected to be paid.

*Fred Ezra Co. v. Pedas,* 682 A.2d 173, 176 (D.C.1996) (quoting *TVL Assocs. v. A & M Constr. Corp.,* 474 A.2d 156, 159 (D.C.1984) (other citation omitted)). " 'Quantum meruit may refer to either an implied contractual or a quasi-contractual duty requiring compensation for services rendered.' " *Fred Ezra Co., supra,* 682 A.2d at 176 (quoting *TVL Assocs.,* 474 A.2d at 159). " 'Quantum meruit' [claims] encompass[ ] both implied-in-law obligations ('quasi contracts') as well as implied-in-fact contracts." *Id.* "Unlike an implied-in-law 'quasi-contract,' an implied-in-fact contract is a true contract that contains all the required elements of a binding agreement." *Id.* (citing *Vereen v. Clayborne,* 623 A.2d 1190, 1193 (D.C.1993)); *see also Fischer v. Estate of Howard L. Flax,* 816 A.2d 1, 11 n. 11 (D.C.2003). "A quasi-contract ... is not a contract at all..., [but] a duty thrust under certain conditions upon one party to requite another in order to avoid the former's unjust enrichment." *Id.* (citing *Vereen,* 623 A.2d at 1194) (other citation and internal quotation marks omitted).

Before turning to the appropriateness of summary judgment on NEC's breach of oral contract and "breach of promise" claims, we address NEC's contention that appellees' motion for summary judgment should have been denied because they did not file a separate and numbered statement of genuine material facts that are not in dispute. Appellees argue that NEC "did not object to the absence of a statement of undisputed facts in the trial court ..., [and that] [t]he existence of undisputed facts was made clear in the briefs and other supporting materials submitted by the parties."

Super. Ct. Civ. R. 12–I(k) states in mandatory language:

*Motions for summary judgment.* In addition to the points and authorities required by subparagraph (e) of this Rule, there shall be served and filed with each motion for summary judgment pursuant to Rule 56 a statement of the material facts numbered by paragraphs as to which the moving party contends there is no genuine issue. Each material fact shall be stated in a separate numbered paragraph. Any party opposing such a motion may, within 10 days after service of the motion upon the party, serve and file a concise statement of genuine issues setting forth all material facts numbered by paragraphs as far as possible to correspond to the paragraphs of the movant's statement of facts claimed not to be in issue as to which it is contended there exists a genuine issue necessary to be litigated. The opponent's statement of disputed material facts shall be stated in separate numbered paragraphs that correspond to the extent possible with the numbering of the paragraphs in the movant's statement of facts claimed not to be in issue. In determining any motion for summary judgment, the Court may assume that the facts as claimed by the moving party are admitted to exist without controversy except as and to the extent that such facts are asserted to be actually in good faith controverted in a statement filed in opposition to the motion. Any statement filed pursuant to this section of this Rule shall include therein references to the parts of the

record relied on to support such statement and shall be a part of the record. Neither the appellant . nor the appellees filed a statement pursuant to Rule 12–I(k).

■■■■ "A party moving for summary judgment has the burden of proving that there is no issue of material fact . . . ." *Willis v. Cheek*, 387 A.2d 716, 719 (D.C. 1978) (citations omitted). Moreover, "[w]hile a trial judge considering a motion for summary judgment is under an obligation to determine whether there are any material issues of fact, material factual disputes must be pleaded in accordance with Super. Ct. Civ. R. 12–I(k) and R. 56(e)." *Woodruff v. McConkey*, 524 A.2d 722, 728 (D.C.1987) (citing *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C.1977) (other citation omitted)); *see also Jane W. v. President and Dirs. of Georgetown Coll.*, 863 A.2d 821, 826 (D.C.2004). However, "[t]he failure to file such a statement 'is not necessarily fatal to appellant's opposition to summary judgment.'" *Miller v. District of Columbia*, 587 A.2d 213, 220 n. 15 (D.C.1991) (citing *Miller v. Greater Southeast Cmty. Hosp.*, 508 A.2d 927, 929 n. 4 (D.C.1986)). The failure to file a statement of material issues not in dispute with the motion for summary judgment also may not be "necessarily fatal" where the moving party demonstrably is entitled to summary judgment as a matter of law.[8] However, a trial court should take care to scrutinize a Rule 56 motion filed without the required Rule 12–I(k) statement to make certain that summary judgment is appropriate under the circumstances of the case.

■■■■ In the case before us we agree with appellees that their failure to file the Rule 12–I(k) statement was not fatal, because, "based on [our] independent review of the record, [we conclude as a matter of law that] the trial judge did not err in granting [appellees'] motion [for summary judgment]" on NEC's claims for breach of oral contract and "breach of promise." *Smith v. Union Labor Life Ins. Co.*, 620 A.2d 265, 268 (D.C.1993) (citation omitted). The record reveals that NEC and NMCG did not enter into an enforceable oral contract for consulting services, because the alleged oral agreement does not meet the requirements of completeness with respect to "all material terms; and . . . intention of the parties to be bound" by an agreement. *Jack Baker, Inc.*, *supra*, 664 A.2d at 1238. The parties did not agree on the terms of payment, nor whether consulting services should be rendered. NMCG focused only on fundraising as NEC's duty and made it quite clear in the March 24, 2000 document, that any compensation would be tied to the amount of capital raised by Ms. Booker, and any other option would be "a deal breaker." Even though Ms. Booker denied receiving the March 24, 2000 document, other aspects of her deposition testimony indicated that there was no agreement on the terms of the contract. NEC/Ms. Booker emphasized distinct consulting and fundraising services. Yet, NMCG was willing to pay NEC only for funds actually raised for the New Markets Equity Fund. Ms. Booker asserted that she discussed both an hourly and a fixed rate of compensation, and that there was agreement on the hourly rate; and that although a rate of " '$150 an hour' was under discussion," the parties "had not reached agreement on a number."

---

8. We emphasize that Rule 12–I(k) mandates that the movant file such a statement while it provides that an opposing party "may . . . serve and file" a countervailing statement. In light of the language of the rule, the trial court, in its discretion, may strike without prejudice a motion for summary judgment that is not accompanied by the required statement, without reaching its merits.

Nothing in the record establishes that NMCG agreed to an hourly rate of $150 for consulting services. Indeed, the deposition testimony of Ms. Booker and a related e-mail of November 29, 2001, reveal there was no oral agreement between the parties for consulting services that met the requirements of completeness by stating an hourly rate of compensation, and intent on the part of NMCG to be bound to pay for consulting services at an hourly rate of $150. In fact, Ms. Booker could say only that as of November 2001, "verbal assurances of compensation had always been provided." At most, then, the parties orally agreed to enter into a written contract which never materialized. And, it cannot be said that such written document would be "a mere memorial of [an] agreement already reached" concerning consulting services, *id.* at 1239, since the parties never agreed on the material terms relating to such services. Consequently, as a matter of law, NEC could not sustain its claim for breach of an oral contract because there was no enforceable contract for consulting services.

■ Nor, as a matter of law, could NEC prevail on its theory of "breach of promise" [or promissory estoppel]. NEC fails to articulate the precise promise that NMCG allegedly made, stating only in its main brief that "at a minimum, the promise of an agreement was made." But, if anything, NMCG promised an agreement if the material terms could be worked out between the parties, and they never were. Since there was no promise, NMCG could not "have expected [NEC] to rely on [any] promise." *Howard Univ. v. Good Food Servs., Inc.,* 608 A.2d 116, 121 (D.C.1992). Under these circumstances, NEC cannot demonstrate reasonable reliance on a promise by NMCG to NEC's detriment. *Id.*

Similarly, NEC's efforts to hold Mr. Wheat and Ms. Hodge individually liable for paying the compensation it demands must fail, as a matter of law, on the record before us because, as to them, there is no credible evidence to support claims of breach of contract, "breach of promise," or quantum meruit. Ms. Booker ultimately stated during her deposition testimony that she discussed compensation only with Ms. Hodge. Therefore, Mr. Wheat could not have made an individual promise to her or to NEC to pay NEC's demand for compensation relating to consulting services. Indeed, paragraph (3) of the complaint alleges that "Mr. Wheat acted as a guarantor of the payment at issue." Hence, contrary to NEC's assertion, Mr. Wheat did not make an "original" or independent promise to pay NEC's/Ms. Booker's compensation. Furthermore, NEC does not identify any statement in the record, made by Ms. Hodge, which shows that she would personally compensate NEC/Ms. Booker for consulting services. To the contrary, the record shows that Ms. Hodge, acting on behalf of NMCG, persisted in telling Ms. Booker that it could not pay consulting fees, only commission fees tied to the generation of capital for the New Markets Equity Fund. Consequently, the $5,000.00 check dated March 27, 2001 stated in the legend "commission advance." Nor do we see how the tender of the $20,000.00 check by NMCG to NEC in June or July 2002 manifests an independent promise on the part of Ms. Hodge or Mr. Wheat to pay NEC's/Ms. Booker's compensation. That check was not drawn on the personal account of either Ms. Hodge or Mr. Wheat; rather, the check was written on the account of NMCG. Nor does Ms. Booker's response to Interrogatory 7 of appellees' first set of interrogatories evidence, without more, a promise on her part to pay NEC fees for consulting services. The response reads, in part,

"Defendant Hodge emphatically stated, on more than one occasion that Plaintiff would be well compensated for the additional consulting services she was providing." This statement, on which NEC relies, does not say, however, that NEC would be well compensated personally by Ms. Hodge.

 NEC characterizes Ms. Hodge and Mr. Wheat as liable independently because of the "leading object" exception to the Statute of Frauds. NEC resorts to this exception because both Delaware and District of Columbia statutes bar actions charging an individual to answer for the debt of another unless there is a written agreement. *See* 6 Delaware Code § 2714(a) and D.C.Code § 28–3502 (2001). The "leading object" exception to the Statute of Frauds provides that: "The maker of a [personal, new and direct promise to pay], though it be merely verbal, is not relieved of the obligation to pay." *Thomas v. Ehrmantraut,* 111 A.2d 623, 624 (D.C. 1955). But the person allegedly making the independent promise must derive a direct, personal benefit. *See Hudson v. Ashley,* 411 A.2d 963, 967 (D.C.1980) ("To establish an original promise, appellant must show that the debt was created at the instance and for the benefit of the promisor.") (Fauntleroy, *Associate Judge,* dissenting) (citing *Thomas, supra* ). We see no evidence in the record that either Mr. Wheat or Ms. Hodge made an independent promise to pay NEC/Ms. Booker's compensation for consulting services. Moreover, and significantly with respect to the leading object exception, there is no record evidence that either Mr. Wheat or Ms. Hodge derived a "direct, personal benefit" from NEC's/Ms. Booker's efforts. *See Hudson, supra,* 411 A.2d at 967, 975. In short, summary judgment in favor of Ms. Hodge and Mr. Wheat in their individual capacities on the breach of contract, "breach of promise," and quantum meruit claims was appropriate as a matter of law on this record.

██ Finally, we turn to that part of NMCG's motion for summary judgment which pertains to the quantum meruit claim for consulting services allegedly performed by NEC/Ms. Booker for NMCG. During her deposition testimony, Ms. Booker steadfastly denied receiving the March 24, 2000 document which clearly set forth NMCG's position that it would pay compensation only for capital raised by NEC/Ms. Booker. And, she claimed that there were "verbal assurances" that she would be compensated for consulting services. In opposition, NMCG maintains that it never agreed to pay for consulting services, only to pay a commission on monies actually raised by NEC/Ms. Booker. Thus, given the significant dispute between the parties over consulting services, and based on our independent review of the record, we hold that there was a genuine material factual issue between the parties relating to NEC's quantum meruit claim, and thus, summary judgment in favor of NMCG was inappropriate.[9] *See Jack Baker, Inc., supra,* 664 A.2d at

---

**9.** Because of our conclusion concerning the existence of a genuine material factual issue in dispute pertaining to the quantum meruit claim, we do not reach NMCG's contention that the affidavit and accompanying exhibit filed by NEC in opposition to NMCG's motion for summary judgment constituted a sham affidavit, except to indicate that the trial court should have ruled on that issue before concluding its consideration of the summary judgment motion. *See Hancock v. Bureau of Nat'l Affairs,* 645 A.2d 588, 590–91 (D.C. 1994); *see also Hinch v. Lucy Webb Hayes Nat'l Training Sch. for Deaconesses & Missionaries Conducting Sibley Mem'l Hosp.,* 814 A.2d 926, 928–31 (D.C.2003); *Weakley v. Burnham Corp.,* 871 A.2d 1167, 1177–78 n. 10 (D.C.2005).

1240.[10]

Accordingly, for the foregoing reasons, we affirm the trial court's order in so far as it grants summary judgment as a matter of law on NEC's "breach of promise" and breach of oral contract claims. However, we reverse the order as it relates to NEC's quantum meruit claim against NMCG and remand the case to the trial court for further proceedings with respect to that claim.[11]

*So ordered.*

---

10. Although there are references to the $20,000.00 check in the record, a copy of the actual check is not part of the record. NMCG contended during oral argument that the $20,000.00 check was sent in an effort to settle litigation, but the record reflects neither any reference to litigation settlement efforts, nor any objection to the discussion of the $20,000.00 check set forth in NEC's response to NMCG's interrogatories.

11. In the event that a subsequent summary judgment motion is filed by either party on the quantum meruit claim, we again call attention to Super. Ct. Civ. R. 12–I(k) requiring,

(1) for a Rule 56 summary judgment motion, "a statement of the material facts numbered by paragraphs as to which the moving party contends there is no genuine issue"; and (2) for an opposition to that motion, "a concise statement of genuine issues setting forth all material facts numbered by paragraphs as far as possible to correspond to the paragraphs of the movant's statement of facts claimed not to be in issue as to which it is contended there exists a genuine issue necessary to be litigated[, etc.]."