H. G. SMITHY COMPANY, Appellant,

v.

WASHINGTON MEDICAL CENTER,
INC., Appellee.

No. 9852.

District of Columbia Court of Appeals.

Argued June 22, 1976.

Decided June 9, 1977.

Charles J. Steele, Washington, D.C., with whom James Edward Ablard, Washington, D.C., was on the brief, for appellant.

Jacqueline Marie Saue, Washington, D.C., entered an appearance for appellant.

George H. Clark, Washington, D.C., with whom William E. Constable, and Michael B. McGovern, Washington, D.C., were on the brief, for appellee.

Before GALLAGHER, NEBEKER and MACK, Associate Judges.

NEBEKER, Associate Judge:

Appellant, H. G. Smithy Company (Smithy), appeals from a judgment of the trial court after a nonjury trial holding that it is not entitled to a commission for procuring a tenant for a building owned by the appellee, Washington Medical Center (Medical Center). Because we agree that the trial court did not err in finding that Medical Center never agreed, either explicitly or implicitly, to hire Smithy as its broker, we affirm.

In 1967, Leo Bernstein, President of the District of Columbia National Bank (DCNB), authorized F. Edward Cavin, then a Vice President of Smithy, to procure a buyer for the DCNB building located at 1812 K Street, N.W., and to acquire new offices for branch locations. Medical Center, a Virginia corporation established for the purpose of buying and selling real estate, owned most of the parcels of land comprising the block in which the DCNB building was located. Consequently, Medical Center mailed a letter to DCNB, in care of Smithy, expressing its interest in the building. Meanwhile, Bernstein suggested to Cavin that he attempt to obtain space for a DCNB branch at the intersection of 18th and K Streets, N.W. Cavin thus sought space for a branch in a building planned for the northwest corner of that intersection. The owner of this building at 1801 K Street was Medical Center. Since Medical Center had not yet appointed a rental agent for the building, Cavin communicated directly with Arthur Morris, the Treasurer and Chairman of the Finance Committee for Medical Center. Negotiations between the two parties, using Smithy as an intermediary, commenced. The first proposed sales contract, dated March 1, 1968, stipulated that DCNB could cancel the sale if DCNB and Medical Center failed to reach an agreement on the terms for the leasing of space in 1801 K Street to DCNB. A second proposed sales contract, dated September 9, 1968, contained two significant provisions: (1) it made the leasing of space in 1801 K Street to DCNB a condition of the sale; and (2) it provided that DCNB would pay a commission to Smithy for Smithy's services.

On January 28, 1969, the President of Smithy wrote Arthur Morris a letter claiming a 2% cash commission for Smithy's efforts leading to the leasing of space in 1801 K Street to DCNB. This letter represented the first attempt by Smithy to put Medical Center on notice that it expected a commission from Medical Center. Arthur Morris responded to this claim by requesting a clarification of Smithy's meaning of a "2% cash commission". In April, 1969, Smithy again demanded a 2% commission from Medical Center. On June 11, 1969, Medical Center and DCNB executed a sales contract for 1812 K Street and a lease agreement for 1801 K Street. At the settlement in September, 1969, Cavin handed to the President of Medical Center a third demand for a 2% commission. With the exception of Arthur Morris' letter requesting clarification of the meaning of a "2% cash commission", Medical Center did not respond to any of these demands and, in fact, refrained from any written communication with Smithy concerning negotiations between itself and DCNB from the date of the first demand until completion of the transaction.

At trial, two facts hampered Smithy's attempt to show its entitlement to a commission. First, there was no written agreement setting forth any agency relationship between Smithy and Medical Center. Second, Cavin, who acted for Smithy in most of its dealings with Medical Center and who therefore would have been privy to any oral agreement between the parties, died before suit was filed. Consequently,

Smithy was forced to rely at trial upon a large number of documents to show the creation of an implied agency. The trial judge determined that no such agency came into being and thus he found that Smithy was not entitled to a commission.

■ In this jurisdiction, the burden of proving an agency relationship rests with the party asserting the relationship. *Goldberg v. Barta*, D.C.Mun.App., 109 A.2d 779 (1954); *McDonald v. Stone*, D.C.Mun.App., 86 A.2d 624 (1952). Furthermore, a broker alleging such relationship must be able to show that the purported principal authorized the broker to act as its agent. Otherwise, the broker is not entitled to a commission even if he procures the party who buys or leases the property in question. Absent authorization, a broker acts as a mere volunteer. *Apostolides v. Colecchia*, D.C.App., 221 A.2d 437 (1966); *Eggleton v. Vaughn*, D.C.Mun.App., 45 A.2d 362 (1946); *Riskin v. Baltimore & Ohio R. R.*, 234 F.Supp. 979 (D.D.C.1964).

■ Since Smithy could not prove the existence of a written or oral contract, it was forced to rely on the theory that an implied-in-fact contract arose between the parties.[1] In *Bloomgarden v. Coyer*, 156 U.S.App.D.C. 109, 479 F.2d 201 (1973), the United States Court of Appeals for this circuit succinctly stated the elements which a broker must prove to demonstrate the existence of an implied-in-fact contract for services. First, the party seeking payment must show that the services were carried out under such circumstances as to give the recipient reason to understand that the services were rendered for the recipient and not for some other person. Second, the party must demonstrate the existence of such circumstances as to put the recipient on notice that the services were not rendered gratuitously. Finally, the party must prove that the services were beneficial to

the recipient. We find the reasoning of that decision persuasive and adopt it.

■ An analysis of the record before this court compels us to agree that the trial court did not err in holding that Smithy failed to prove satisfactorily the existence of those elements. Smithy's inability to prove those elements largely arises from the ambiguous circumstances surrounding the negotiations leading to the procuring of DCNB as a tenant. These circumstances were deemed by the trial court to be insufficient to put Medical Center on notice either that Smithy considered itself to be an agent of Medical Center or that Smithy expected a commission. Furthermore, it could be inferred that Medical Center in fact did not benefit from Smithy's efforts.

Significantly, Smithy began the transactions between Medical Center and DCNB in the role of DCNB's agent. Medical Center knew this since its correspondence with DCNB was mailed to Smithy rather than to DCNB. Nothing in the record indicates that Smithy did anything to change Medical Center's impression that Smithy was acting as an agent for DCNB rather than for Medical Center until Smithy informed Medical Center on January 28, 1969, that it expected a commission from Medical Center. By that late date, negotiations had been continuing for a year and the lease agreement and the sales contract were in the final stages of drafting by counsel fo.' Medical Center and DCNB. In contrast to this last minute notice that Smithy expected to be compensated by Medical Center is the clause placed in the first draft of the sales contract in February, 1968, which expressly provided that DCNB would pay a commission to Smithy for Smithy's work in selling 1812 K Street. Consequently, Smithy's actions would not only fail to dispel Medical Center's impression that Smithy

1. We note that D.C.Code 1973, § 45–1408(n), provides for the suspension or revocation of the license of any real estate broker who attempts to secure a tenant to rent property without first obtaining written permission from the owner of the property. There is testimony in the record to indicate that the custom among

real estate brokers in this jurisdiction is to obtain advance written approval to secure a tenant only when dealing with rental residential property. Since the statute makes no distinction between commercial and residential property, we question the relevance of such testimony and the legal basis for the custom.

was acting for DCNB, but would also have a tendency to strengthen this impression by virtue of the long time that Smithy waited before requesting a commission from Medical Center, and of the unambiguous demand for a commission made of DCNB. Further arguing against acquiescence by Medical Center in an implied-in-fact contract is the fact that Medical Center had no further written communication with Smithy concerning negotiations on the sale or the lease after this first manifestation by Smithy of an expectation of a commission.

Two aspects of the relationship between Medical Center and Smithy helped to obscure Smithy's motivation in procuring a tenant for 1801 K Street and consequently increased Smithy's difficulties in meeting its burden of demonstrating that its services were carried out under such circumstances as to give Medical Center reason to understand that the services were rendered for Medical Center with the expectation of payment by Medical Center. Both of these aspects were noted by the trial court in its memorandum opinion.

The trial court's opinion observed that at the time the instant negotiations were taking place, Medical Center was in the process of deciding which real estate agent should be hired to manage the leasing of space in the 1801 K Street building. Smithy was actively seeking this management contract. Apparently in an attempt to demonstrate its aptitude in leasing space in 1801 K Street, Smithy sought to negotiate leases in that building for at least two other businesses. Thus, Smithy's motivation in securing DCNB as a tenant was obscure. Medical Center could reasonably infer that Smithy's motivation was to obtain the contract for management of the entire building.

The trial court's opinion also noted that the leasing of space in 1801 K Street to DCNB was a condition precedent to the sale of the DCNB building. Consequently, Smithy needed to obtain space in 1801 K Street for DCNB if Smithy was to receive its commission for the sale of the DCNB building. Thus, the trial court found that, even if Medical Center had hired a real estate broker to negotiate the leasing of space in 1801 K Street, Smithy's conduct in all probability would not have been substantially different. The only difference would have been that Smithy would have negotiated with the authorized broker rather than with Arthur Morris, the Treasurer and Chairman of the Finance Committee for Medical Center. Therefore, the services performed by Smithy would not have been sufficient, in and of themselves, to put Medical Center on notice that Smithy was acting on its behalf or that Smithy expected a commission from it. This finding by the trial judge that Smithy's role in the negotiations probably would not have been much different had Medical Center hired a real estate agent to manage the leasing of space in 1801 K Street carries further significance in that it implies that Medical Center received no real benefit from Smithy's efforts. Absent benefit by the principal, an implied-in-fact contract for services cannot come into being. *Bloomgarden v. Coyer, supra.*

The record in this case thus permits a holding of the inability of Smithy to point to circumstances which would have indicated to Medical Center that Smithy was acting as an agent for it rather than for DCNB, and that Smithy expected a commission from it. Rather, the circumstances surrounding the procuring of DCNB as a tenant were just as consistent with Smithy's acting as DCNB's agent as they were with Smithy's acting as an agent for Medical Center. As a result, those circumstances could be deemed insufficient to put Medical Center on notice that Smithy expected a commission from it. Unless a recipient of services is put on notice by unambiguous circumstances that the party providing those services is working for the recipient with the expectation of compensation from the recipient, the recipient cannot be held liable for a commission even if the recipient makes use of those services. *See Bloomgarden v. Coyer, supra; In re Coho,* 421 Pa. 448, 219 A.2d 657 (1966). Furthermore, it is unclear whether the services performed by Smithy were in fact beneficial to Medical Center since those services

were no more extensive than those which would have been performed by Smithy had Medical Center appointed a broker to handle the leasing of space in 1801 K Street. Consequently, Smithy could be viewed as having failed to prove the existence of an implied-in-fact contract and thus cannot recover on that theory.

Smithy alternatively contends that it is entitled to a commission on a quasi-contract theory. That theory of recovery can only be invoked, however, if it would be unjust for the recipient to retain the benefit conferred. *Bloomgarden v. Coyer, supra* at 119–20, 479 F.2d at 211–12. Even assuming that a benefit was conferred upon Medical Center, no such injustice can be shown in this case. Medical Center was under no notice that a commission was expected from it. Under such circumstances, an action on a quasi-contract theory will not lie. *Id.* at 120, 479 F.2d at 212. Furthermore, the law in this jurisdiction requires that a broker must clearly demonstrate a contractual right to a commission. *See Apostolides v. Colecchia, supra; Eggleton v. Vaughn, supra; Riskin v. Baltimore & Ohio R. R., supra.* To allow recovery on a quasi-contract theory in the absence of a true contract would necessarily subvert the public policy behind this law. Consequently, the granting of relief on a quasi-contract theory would be an inappropriate remedy in this case.

Since the trial court's finding that no implied-in-fact contract for services arose between Smithy and Medical Center is amply supported by the evidence, and since recovery on a quasi-contractual basis would not meet the ends of justice,[2] the judgment of the trial court must be and is

*Affirmed.*

2. D.C.Code 1973, § 17–305(a).