The **FRED EZRA COMPANY**, Appellant,

v.

Theodore **PEDAS** et al., Appellees.

No. 95–CV–631.

District of Columbia Court of Appeals.

Argued March 13, 1996.

Decided Aug. 22, 1996.

---

Edward J. Maginnis, with whom Mark A. Gilday was on the brief, Bethesda, MD, for appellant.

Jacob A. Stein, with whom Robert L. Bredhoff, and Nancy R. Grenier were on the brief, Washington, DC, for appellees.

Before SCHWELB, KING and RUIZ, Associate Judges.

RUIZ, Associate Judge:

Appellant, The Fred Ezra Company, a licensed real estate broker, commenced this suit alleging that appellees, Square 74 Associates Limited Partnership through its general partners, owed appellant brokerage fees based on theories of quantum meruit and unjust enrichment. Pursuant to Superior Court Rule of Civil Procedure 12(b)(6), appellees filed a motion to dismiss for failure to state a claim upon which relief could be granted, claiming that the law in the District of Columbia prohibits recovery of broker commissions on quasi-contract theories. The trial court granted appellees' motion, and appellant filed a motion to alter the judgment pursuant to Superior Court Rule of Civil Procedure 59(e), which was denied. Appellant appeals from the trial court's dismissal. We reverse.

Appellant contends that the trial court erred in dismissing its claim for brokerage fees. In considering a motion to dismiss a complaint for failure to state a claim, this court shall construe the facts on the face of the complaint in the light most favorable to the non-moving party, and accept as true the allegations in the complaint. *Cauman v. George Washington Univ.*, 630 A.2d 1104, 1105 (D.C.1993); *Vincent v. Anderson*, 621 A.2d 367, 372 (D.C.1993). Dismissal "is warranted only when 'it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief.' " *Klahr v. District of Columbia*, 576 A.2d 718, 721 (D.C.1990) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)); *McBryde v. Amoco Oil Co.*, 404 A.2d 200, 202 (D.C. 1979). Our summary of the facts is therefore based on the allegations in appellant's complaint.

According to appellant's complaint, the facts giving rise to this dispute occurred in 1991, when appellant was asked by the World Bank/International Finance Corporation (IFC) to assist it in locating sites for expansion. Appellant located and contacted appel-

lees regarding property located at 21st Street and Pennsylvania Avenue, in Northwest Washington, D.C. On March 1, 1991, knowing appellant to be a broker, appellees' representative met with appellant and a representative of IFC for a tour of the property. At the request of IFC, its identity was not disclosed to appellees. On April 2, 1991, appellant sent a letter to appellee Mr. James Pedas, a general partner of Square 74, stating that appellant had found a prospective purchaser for the property at 21st and Pennsylvania, but that the buyer at this point preferred to remain undisclosed. After several meetings, letters and telephone conversations between appellant and appellees, appellant disclosed IFC's identity to appellees. In response to a letter from appellant requesting further information about the property, appellees responded on November 15, 1991, that they did not authorize appellant to act on their behalf with regard to IFC or the property. Appellant learned that sometime in July of 1992, appellees and IFC entered into an agreement to purchase the property, and that IFC was currently advertised as the future occupant of the property.

In its complaint, appellant alleged appellees knew that appellant is "a commercial real estate broker in the business and charging fees on a commission basis such that, if a transaction took place [between IFC and appellees, appellant] was employed by [appellees] as broker for that transaction." The complaint alleged that appellees also knew that appellant's work would be compensated by "a commission based on the benefit conferred upon [appellees]." Appellant also contends that IFC and appellees were introduced through appellant's efforts, and that it "was employed and was the procuring cause of any contract between IFC and the appellee regarding the Property." The complaint asserted two counts, one for quantum meruit, which emphasized appellees' knowledge that appellant is a commercial real estate broker, and one for unjust enrichment, which emphasized the benefit conferred on appellees by appellant's efforts.

Granting the motion to dismiss, the trial court concluded that appellant's complaint failed to state a claim because it did not have a contractual basis, as required by *H.G. Smithy Co. v. Washington Medical Ctr., Inc.,* 374 A.2d 891 (D.C.1977), but was based, instead, on theories of quantum meruit and unjust enrichment. The trial court further stated that the relevant issue is whether appellees were put on notice that appellant expected appellees to pay it a broker's fee. Finding that the facts alleged in the complaint did not support that appellees had such notice, the trial court dismissed the complaint.

We agree with the trial court that in order to recover broker's fees, appellant must have a contractual basis for the claim. We disagree with the trial court's conclusion that the complaint does not allege sufficient facts to allege a contractual basis for its claim, specifically an implied-in-fact contract.

▮▮▮ The appellant contends that the trial court erred by finding that appellant failed to state a claim under quantum meruit and unjust enrichment theories. The terms "quantum meruit" and "unjust enrichment" are often used when referring to quasi-contract theories. E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS § 2.20 (1990). A "quasi-contract" is an obligation that is

"implied-in-law," is not a contract at all, in the sense that the word "contract" is ordinarily understood. "Contract" imports a voluntary agreement to make an exchange. Rather, a contract implied-in-law, "more commonly known as a theory of unjust enrichment, ... [is] 'a duty thrust under certain conditions upon one party to requite another in order to avoid the former's unjust enrichment.'" *Vereen [v. Clayborne,* 623 A.2d 1190, 1194 (D.C. 1993)] (quoting *Bloomgarden [v. Coyer,* 156 U.S.App. D.C. 109, 116, 479 F.2d 201, 208] (footnote omitted)). To recover on a theory of unjust enrichment, also known (unhelpfully) as "quasi-contract," the plaintiff "must show that [the defendant] was unjustly enriched at his expense and that the circumstances were such that in good conscience [the defendant] should make restitution." *Id.*

*Emerine v. Yancey,* 680 A.2d 1380, 1383 (D.C.1996). Contrary to appellant's contention, the law in this jurisdiction does not allow recovery for services rendered under

so-called quasi-contract theories in the absence of a true contract expressing a binding agreement between the parties.

This court stated in dictum in *Smithy* that "the law in this jurisdiction requires that a broker must clearly demonstrate a contractual right to a commission. To allow recovery on a quasi-contract theory in the absence of a true contract would necessarily subvert the public policy behind this law." *Smithy, supra,* 374 A.2d at 895 (citations omitted). While the appellant urges us not to adopt this position, we believe that *Eggleton v. Vaughn,* 45 A.2d 362 (D.C.1946), forecloses a different result.

■ In *Eggleton,* a real estate salesman sued a real estate broker for a commission collected by the broker on a sale made while the salesman was employed by the broker. In reversing the trial court's finding in favor of the real estate salesman, this court stated that "[i]f no contract authorizing one to act as agent exists, he is not entitled to compensation for his efforts.... One seeking to obtain compensation as an agent must prove his contract of employment before he can recover for work done for an alleged principal. The fact that one is the procuring cause of a sale does not entitle him to a commission unless he had authority to sell." *Id.* at 363 (citations omitted). We find this rationale compelling and conclude that in order for a broker, as agent, to recover against the seller, as principal, the broker must first establish that they voluntarily entered into a principal-agent relationship that gives rise to the broker's contractual right to the commission.

■ Our conclusion that a contractual basis must underlie appellant's claim, however, does not necessarily lead to dismissal of the complaint, if it can be construed—in favor of appellant, as we must—to support a contractual claim for broker fees. We note, first, that count one of the complaint is for "quantum meruit." To recover on a quantum meruit claim

(1) valuable services must be rendered [by the plaintiff]; (2) for the person sought to be charged; (3) which services were accepted by the person sought to be charged, and enjoyed by him or her; and (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services, expected to be paid.

*TVL Assocs. v. A & M Constr. Corp.,* 474 A.2d 156, 159 (D.C.1984) (alteration in original) (quoting *In re Rich,* 337 A.2d 764, 766 (D.C.1975)). "Quantum meruit may refer to either an implied contractual or a quasi-contractual duty requiring compensation for services rendered." *TVL, supra,* 474 A.2d at 159. Thus, a request for "quantum meruit," which is a measure of damages and not a legal theory of recovery, encompasses both implied-in-law obligations ("quasi-contracts") as well as implied-in-fact contracts. Unlike an implied-in-law "quasi-contract," an implied-in-fact contract is a true contract that contains all the required elements of a binding agreement. *Vereen v. Clayborne,* 623 A.2d 1190, 1193 (D.C.1993). An implied-in-fact contract "differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." *Id.* (quoting *Bloomgarden v. Coyer,* 156 U.S.App.D.C. 109, 116, 479 F.2d 201, 208 (1973)).

■ In order to demonstrate the existence of an implied-in-fact contract for services, a broker must prove the following elements:

First, the party seeking payment must show that the services were carried out under such circumstances as to give the recipient reason to understand that the services were rendered for the recipient and not for some other person. Second, the party must demonstrate the existence of such circumstances as to put the recipient on notice that the services were not rendered gratuitously. Finally, the party must prove that the services were beneficial to the recipient.

*Smithy, supra,* 374 A.2d at 893.

■ Appellant emphasizes specific paragraphs in its complaint to support each element of an implied-in-fact contract. First, appellant must prove that its services were carried out under circumstances which gave appellees reason to believe that the services were rendered for them and not for someone

else. Three separate paragraphs in the complaint allege that appellees knew the appellant is a commercial real estate broker in the business of charging fees on a commission basis. Paragraph five, for example, states that "[appellees] knew at all relevant times that [appellant] was a commercial real estate broker in the business and charging fees on a commission basis such that, *if a transaction took place with the undisclosed party, [Ezra] was employed by [defendant] as broker for that transaction.*" (Emphasis added). Because, for purposes of a motion to dismiss pursuant to Super. Ct. Civ. R. 12(b)(6), allegations in the complaint must be assumed to be true, *see, e.g., Abdullah v. Roach,* 668 A.2d 801, 804 (D.C.1995), the trial court was required to treat as true the allegation that "Ezra was employed by Defendant as broker for that transaction," as according to the complaint, a transaction in fact took place with the "undisclosed party." [1] If, as is alleged in paragraph five, appellees knew that appellant was a commercial real estate broker who expected fees from appellees, appellant satisfied the first element of an implied-in-fact contract.

The second element, requiring appellant to demonstrate circumstances which put appellees on notice that the services were not free, can also be found in paragraph five of the complaint. Finally, appellant must prove that the services rendered were beneficial to appellee. Paragraph fifteen of the complaint satisfies the third element in alleging, "[appellees] [have] received valuable consideration from the efforts of [appellant]

in introducing the purchaser of the Property to [appellees] and in providing the purchaser with knowledge of the Property and information concerning the Property as well as arranging for the purchaser to view the Property and to be introduced to and meet with representatives of [appellees]." Viewing the facts alleged in the complaint in the light most favorable to appellant, we find that the complaint contained assertions concerning the existence of an implied-in-fact contract sufficient to withstand a 12(b)(6) motion.[2]

There is one final matter which was not raised in the trial court that is appropriate to address at this time. Pursuant to D.C. Appellate Rule 28(k), appellees brought to the court's attention the District of Columbia Real Estate Licensure Act of 1982, D.C.Code § 45–1945 (1996), which provides that "[a] written listing contract is required in the District for the sale of all real property." [3] Appellees contend that in the absence of a written listing contract [4] the statute precludes appellant from collecting a commission under a theory of quantum meruit.

This court has never had the opportunity to decide whether § 45–1945 precludes the enforcement of unwritten contracts to pay a real estate commission. We find the rationale in *Cassidy & Pinkard, Inc. v. Jemal,* 899 F.Supp. 5 (D.D.C.1995) instructive.[5] As the court noted in *Cassidy,* the language of § 45–1945 does not address a party's ability to collect a commission based on an unwrit-

---

1. At oral argument, appellee pressed a more limited interpretation of paragraph five of the complaint, based upon the words "such that" preceding the phrase italicized in the text. Such close and strict reading of the complaint is inappropriate at this preliminary stage of the litigation.

2. We note that the present case is in a procedurally different posture than that of Smithy, *supra,* on which appellees rely to support the trial court's dismissal of the complaint. The *Smithy* court dismissed the case after hearing evidence at a bench trial; here we are only reviewing the allegations in the complaint to determine whether or not a claim for relief has been stated.

3. Appellants, in turn, referred the court to *Cassidy & Pinkard, Inc. v. Jemal,* 899 F.Supp. 5

(D.D.C.1995). The court requested that the parties address the issue at oral argument.

4. A written listing contract means "a contract between a broker and an owner in which the owner grants to the broker the right to find a purchaser for a designated property at the price and terms the owner agrees to accept, and the broker, for a fee, commission, or other valuable consideration, promises to make a reasonable effort to obtain a purchaser for the term of the contract." D.C.Code § 45–1922(14) (1996).

5. We believe that the approach taken by the district court in the District of Columbia in *Cassidy* is more persuasive than that of the district court in Virginia in *Hamady v. Trammell Crow Asset Co.,* 824 F.Supp. 580, 582 (E.D.Va.1993).

ten contract.[6] *Id.* at 7. The court looked to the District's common law to determine when recovery of a commission under an oral listing contract was enforceable. *Id.* (citing *Regional Redevelopment Corp. v. Hoke*, 547 A.2d 1006, 1011 n. 5 (D.C.1988)) (holding that oral listing agreement did not preclude recovery of a commission); *see Apostolides v. Colecchia*, 221 A.2d 437, 438 (D.C.1966) ("[A] broker who offers property without the written consent of the owner and secures a qualified buyer does not lose his right to a commission."). As the *Cassidy* court noted, "[t]he legislative history of § 45–1945 does not reflect an intent to change the common law relating to the payment of real estate commissions." *Cassidy, supra*, 899 F.Supp. at 7. This court has stated before that " '[n]o statute is to be construed as altering the common law, farther than its words import.' " *Dell v. Department of Employment Serv.*, 499 A.2d 102, 107 (D.C.1985) (quoting *Shaw v. Merchants' Nat'l Bank*, 101 U.S. 557, 565, 25 L.Ed. 892 (1879)).

■ Guided by the above principle, we hold that the enactment of the Real Estate Licensure Act of 1982, D.C.Code § 45–1945, has not changed the common law with respect to the enforceability of unwritten contracts for broker fees. Thus, § 45–1945 does not bar the enforcement of unwritten implied-in-fact contracts to pay a real estate commission.[7]

The grant of appellee's motion to dismiss appellant's complaint is hereby reversed. The trial court is instructed to reinstate the complaint.

---

6. The statute does provide, on the other hand, that failure to enter into written listing contracts subjects brokers to sanctions, including civil and criminal penalties. D.C.Code § 45–1946 (1996).

7. The enactment of § 45–1945, however, clearly establishes a policy in favor of written listing contracts. The purpose of the Act in part is "to protect the public against incompetence, fraud, and deception in real estate transactions." D.C.Code § 45–1921 (1996). In light of that policy, in order to recover a commission based on an unwritten contract, the claimant has a heavy burden to establish its contractual right to the commission.