**STEUART INVESTMENT COMPANY,**
Appellant/Cross–Appellee,

v.

**THE MEYER GROUP, LIMITED,**
Appellee/Cross–Appellant.

Nos. 11–CV–20, 11–CV–346.

District of Columbia Court of Appeals.

Submitted Feb. 7, 2012.

Decided March 7, 2013.

---

T. Michael Guiffre, Washington, DC, was on the brief for Appellant/Cross–Appellee.

Michael K. Ross, Washington, DC, was on the brief for Appellee/Cross–Appellant.

Before OBERLY and BECKWITH, Associate Judges, and REID, Senior Judge.

BECKWITH, Associate Judge:

This case arises from a dispute over a commercial real estate broker's commission for months of work negotiating a long-term multi-million-dollar lease agreement between a real estate investment company and the non-profit organization that sought to expand and continue its operations in a large building owned by that company. Though the parties agree that it was standard in the industry for landlords to pay the tenant's broker's commission fee and that the broker in this case all along expected the landlord to pay the standard 3 percent commission, they disagree about whether the landlord's refusal to pay the broker's commission was the breach of an implied-in-fact contract or simply the result of the parties' failure to agree on a specific commission. Superior Court Judge Cheryl Long concluded that the landlord breached an implied contract and, after a two-day bench trial, awarded the broker damages that amounted to a 3 percent commission on the aggregate value of the ten-year lease. The landlord now challenges the trial court's determination that an implied-in-fact contract for brokerage fees existed between the two parties, as well as the court's determination that the landlord was responsible for the broker's commission under principles of unjust enrichment and equitable estoppel. In a cross-appeal, the broker disputes the trial court's damage calculation and seeks prejudgment interest on the sum. Because we agree that an implied-in-fact contract existed between the parties and that the trial court properly calculated the damages, we affirm the judgment of the Superior Court.

## I. Background

Steuart Investment Company, the appellant and cross-appellee in this case, is an established player in the local commercial real estate market and owns, among other real estate assets, the building located at 4646 40th Street, N.W., in Washington, D.C. The Meyer Group, the appellee and cross-appellant, is a commercial real estate broker that, according to the trial testimony of its founder and president, William Meyer, specializes in assisting tenants in "negotiations with either their existing landlord or a future landlord in lease terms that would be both fair market and acceptable to both parties."

In 1998, the Center for Applied Linguistics (CAL) hired The Meyer Group to assist with lease negotiations for the 40th Street property. Another commercial lease broker represented Steuart during these negotiations. On July 14, 1998, Steuart and CAL entered into a ten-year lease with an option to renew for an additional five years. Upon execution of the lease and pursuant to a commission agreement, Steuart paid The Meyer Group a 3 percent commission on the aggregate lease value, which was calculated as the base annual rent multiplied by ten years. According to an expert witness The Meyer Group called at trial—a commercial lease broker who had worked in the District of Columbia's commercial lease market for 25 years—such an arrangement is typical, and brokers are compensated by the landlord "99.9" percent of the time. The broker-client relationship between CAL and The Meyer Group ended when CAL took possession of the property.

In 2006, eight years into its ten-year lease, CAL, now running out of room, interviewed several brokers and once again selected The Meyer Group to help it secure space and negotiate a lease for when its existing lease expired. The retainer agreement The Meyer Group and CAL signed in October of 2006 recognized that "the landlord generally assumes responsibility for the commission" and indicated that CAL would "require, as a condition of entering into a lease agreement, that the landlord undertake an obligation to pay a commission (in accordance with typical market rates)" to The Meyer Group.

After assessing its options, CAL decided to stay in the 40th Street property and to negotiate a new ten-year lease with Steuart Investment Company. The Meyer Group first contacted Steuart on January 31, 2007, seeking to confirm that the deadline for exercising the optional five-year lease extension was September 24, 2007.[1] On March 13, 2007, The Meyer Group sent Steuart Investment Company a commission letter stating that if a lease between CAL and Steuart were successfully negotiated, Steuart would agree to pay The Meyer Group the industry standard commission for its brokerage services—specifically, a "cash commission in the amount equal to Three Percent (3%) of the gross aggregate rental including any fixed escalations, less any free rent, up to a term of Ten (10) years[.]"

The Meyer Group sent a commission letter to Steuart on at least three occasions, in March, May, and June of 2007. Steuart's managers received these letters but never returned countersigned copies.

At trial, William Meyer testified that Steuart provided oral assurances that "I'd get paid, not to worry about it." Steuart's representatives disputed that they ever orally agreed to pay a 3 percent commission, but they continued to negotiate the lease throughout the remainder of 2007 and into 2008 knowing that The Meyer Group expected payment. According to William Meyer, these negotiations were unusually difficult because Steuart had not hired its own broker and the managers with whom he was working were not very experienced in handling such matters. Mr. Meyer stated that "[i]t was horrible for me" and that "it was probably three times as much work."

On December 18, 2007, Steuart Investment Company presented a term sheet for a ten-year lease that provided that any commission would be negotiated in a separate agreement. In case the parties could not agree on terms for a ten-year lease, Steuart also mailed a draft term sheet for a five-year renewal of the existing lease. In an email also dated December 18, Guy Steuart III, one of the managers of Steuart Investment Company, informed his brothers Clark and Brad Steuart that "[a]lthough I don't say so in the [letter of intent], we will only pay Myers [sic] group a 2.5% commission on the renewal." Steuart never communicated to The Meyer Group this intent not to pay the 3 percent commission it knew The Meyer Group was expecting.

The following month, on January 30, 2008,[2] Steuart submitted a revised term sheet providing, among other terms, that

---

1. Eight months later, while the new ten-year lease was still being negotiated, The Meyer Group—concerned about the approaching deadline for exercising CAL's five-year renewal option under the initial lease—informed Steuart that CAL would, "at the very least," exercise that renewal option.

2. The document reflects a date of January 30, 2007, but the parties agree it should have been dated January 30, 2008.

The Meyer Group "shall be paid Two percent (2%) of the aggregate lease value of the base lease term (aggregate lease value to include offsets for Leasehold Improvements and Rent Abatements.)" The next day, Guy Steuart III sent another email informing his brothers that he was limiting The Meyer Group's commission to 2 percent and predicting that William Meyer "will flip over the commission" but that the parties would then "negotiate how to bridge that gap." The parties continued to exchange draft term sheets, with Steuart Investment Company offering a 2 percent commission on the aggregate value of the base lease term and The Meyer Group insisting on the commission it had all along specified—a 3 percent commission on the aggregate lease value, including rent escalations.

By March 2008, the terms of the new lease between CAL and Steuart had been fully negotiated. The lease that resulted, dated June 19, 2008, substantially modified the 1998 lease,[3] and in the view of the trial court, Steuart Investment Company had benefited from The Meyer Group's work and professional advice throughout the lengthy negotiation process, which resulted in a favorable long-term lease of Steuart's property.

Though the landlord and tenant had a lease, the dispute over the broker's commission remained unresolved. The new lease provided that "Landlord and Tenant each warrant to the other that in connection with this Amendment neither has employed or dealt with any broker, agent or finder, other than The Meyer Group, Ltd. (the "Broker")," and that "Landlord acknowledges that it shall pay any commission or fee due to the Broker with respect to this amendment[.]" On May 21, 2008, The Meyer Group sent Steuart Investment Company an invoice for the amount of $191,962.07.[4] On August 1, 2008, CAL's lawyer mailed a second invoice and demand for payment on The Meyer Group's behalf. Steuart never paid.

The Meyer Group filed a lawsuit seeking money damages. Superior Court Judge Long presided over a two-day bench trial at which The Meyer Group presented the testimony of its president, William Meyer; its commercial real estate expert, Randolph Harrell; and two representatives of Steuart Investment Company, Guy Steuart III and the company's property manager, Bradley Steuart. At the trial's conclusion, the court ruled in favor of The Meyer Group and on December 8, 2010, issued detailed findings of fact and conclusions of law awarding The Meyer Group $166,046.76 in damages, plus costs and post-judgment interest. The court concluded that Steuart Investment Company was liable for this amount under three alternative theories—namely, that Steuart had an implied-in-fact contract to pay The Meyer Group's commission, that Steuart benefited from unjust enrichment, and that

---

3. Although the document was entitled "Second Amendment to Agreement of Lease," the trial court found, based primarily upon the testimony of Guy Steuart, that there was no genuine confusion among the parties that the 2008 lease was a new lease, and that it was only after litigation commenced that Steuart Investment Company began to characterize the new lease as a mere renewal of the prior lease.

4. William Meyer testified that it was common practice to send invoices prior to receipt of the signed lease documents. The Meyer Group's invoiced amount included the 2.75 percent rent escalation in its calculation. Thus, the commission amount was calculated by adding the gross rent for each year and applying a 3 percent commission. The Meyer Group conceded that the amount it initially invoiced incorrectly included rent abatements, thus the aggregate lease value was miscalculated by $111,816.00.

Steuart was equitably estopped from contesting its obligation to pay Meyer's commission. The court found the compensable commission to be 3 percent, and calculated the aggregate lease value as the base rent for the lease term of ten years, minus the rent abatement of $111,816.00, totaling $5,534,892. The court declined to include rent escalations in the aggregate lease value[5] and denied prejudgment interest because The Meyer Group did not specifically demand it in the complaint and failed to establish that prejudgment interest was necessary to make it whole.

On December 20, 2010, The Meyer Group filed a Motion to Amend Judgment, challenging the trial court's exclusion of rent escalations from the aggregate lease value and its denial of prejudgment interest. The court denied The Meyer Group's motion on February 16, 2011. The Meyer Group and Steuart Investment Company now both appeal the trial court's judgment.

## II. Analysis

### A. The Implied–In–Fact Contract Claim

■■ The first of the three theories upon which the trial court based its determination that Steuart owed The Meyer Group its commission for negotiating the lease between Steuart and CAL was that Steuart breached an implied contract with The Meyer Group. In that regard, Ste-uart argues that our case law precludes a finding of an implied-in-fact contract in situations like this one, where The Meyer Group was working for CAL, the prospective tenant. The Meyer Group counters that our case law explicitly contemplates the existence of an implied-in-fact contract under these very circumstances and that the trial court correctly determined that the broker here satisfied each of the elements of such an implied contract.[6]

■■ " 'An implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt.' " *Vereen v. Clayborne,* 623 A.2d 1190, 1193 (D.C.1993) (quoting *Bloomgarden v. Coyer,* 479 F.2d 201, 208 (D.C.Cir.1973)). In the context of a commission for a broker where there is no written commission agreement, we have required a broker to show three things in order to establish the existence of an implied-in-fact contract. *H.G. Smithy Co. v. Washington Med. Ctr., Inc.,* 374 A.2d 891, 893 (D.C.1977). First, the broker must establish "that the services were carried out under such circumstances as to give the recipient reason to understand that the services were rendered for the recipient

---

5. The trial court also refused to include in the aggregate lease value an additional sum to account for the lease being "net of electric," where the tenant is responsible for its electric charges, instead of "full service," where the landlord pays all costs, because the parties had never contemplated this prior to litigation. The Meyer Group has not appealed this finding.

6. In reviewing an appeal from a non-jury trial, this court "may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (2001); *see, e.g., Zoob v. Jordan,* 841 A.2d 761, 764 (D.C.2004). Thus, "a trial court's findings of fact will not be disturbed unless they are clearly erroneous" when viewed in the light most favorable to the prevailing party. *Cahn v. Antioch Univ.,* 482 A.2d 120, 128 (D.C.1984); *Hinton v. Sealander Brokerage Co.,* 917 A.2d 95, 101 (D.C. 2007). We review the trial court's legal conclusions de novo. *Hutchison Bros. Excavating Co. v. District of Columbia,* 511 A.2d 3, 6 (D.C.1986).

and not for some other person." *Id.* Second, the broker "must demonstrate the existence of such circumstances as to put the recipient on notice that the services were not rendered gratuitously." *Id.* Third and finally, the broker "must prove that the services were beneficial to the recipient." [7] *Id.*

■ In *Fred Ezra Co. v. Pedas,* 682 A.2d 173 (D.C.1996), a case in which this court addressed whether a real estate broker hired by a potential tenant had alleged sufficient facts to support a claim that he had an implied-in-fact contract with the landlord, we stated that the broker would "satisf[y] the first element of an implied-in-fact contract" by establishing that the landlord "knew that appellant was a commercial real estate broker who expected fees from [the landlord]." *Id.* at 177. The record here is full of concrete proof that Steuart Investment Company knew The Meyer Group was a commercial real estate broker that was negotiating the lease between the landlord, Steuart, and the tenant, CAL, with every expectation that Steuart would pay its commission. Most notably, William Meyer repeatedly sent Steuart Investment Company a commission letter spelling that out in plain terms. We know that the company received those letters, and the various statements of Steuart's representatives—for example, Guy Steuart III's acknowledgement that William Meyer would "flip" when he learned that Steuart was planning to pay only a two percent commission—further confirm that Steuart knew William Meyer expected Steuart to pay him. The parties' written agreements—specifically, The Meyer Group's agreement with CAL and the lease between CAL and Steuart—also more formally evinced the expectation shared by all of the parties that the landlord in this case would be paying the broker's commission.

Steuart Investment Company challenges the notion that an implied-in-fact contract can exist in the admittedly idiosyncratic context of commercial brokerage relationships, where, as The Meyer Group's expert witness testified at trial, the industry practice is for landlords to pay the commission of brokers who are hired by, and who work in the interest of, the prospective tenants. Steuart argues, more specifically, that the requirement in *Smithy* that services be "rendered for the recipient and not for some other person," *Smithy,* 374 A.2d at 893, precludes any finding of an implied-in-fact contract involving brokers in commercial real estate deals like the one at issue in this case, as the peculiarity in the industry that has landlords paying the tenants' brokers' commissions means the brokers are rendering services for the tenant, and thus "some other person" other than the landlord. In Steuart's view, unless it had specifically authorized William Meyer to act as its agent in the negotiations, The Meyer Group was, in effect, acting as a "mere volunteer." *See id.*

Steuart's contention cannot be reconciled with "the reasons underlying" the requirements of an implied-in-fact contract, which seek to preclude implication of a contract where the services "are not really helpful to the recipient," where the recipient "not unreasonably fails to realize

7. The *Smithy* test is a derivation of the elements required to establish an implied-in-fact contract as defined by the United States Court of Appeals for the District of Columbia Circuit in its 1973 decision in *Bloomgarden,* 479 F.2d at 208–09: "the party seeking payment must show (1) that the services were carried out under such circumstances as to give the recipient reason to understand (a) that they were performed for him and not for some other person, and (b) that they were not rendered gratuitously, but with the expectation of compensation from the recipient; and (2) that the services were beneficial to the recipient."

that the services were rendered for him in contemplation of *quid quo pro* for value conferred," or where "[a]ctivities beneficial to a party ... proceed on behalf of another" or are "engaged in without thought of remuneration." *Bloomgarden*, 479 F.2d at 209. That is not this case. This is a case in which all of the parties contemplated—and articulated at various times both orally and in writing—that Steuart Investment Company would pay The Meyer Group's commission. This is a case in which everyone knew such an arrangement was standard practice in the industry. It is thus a case that does not remotely spark the concerns detailed in *Bloomgarden* and embodied in the first element of the implied-in-fact contract that someone might unwittingly be held responsible for services that inadvertently benefited him while being mainly rendered for someone else.

Our decision in *Fred Ezra* likewise disallows so exacting an interpretation of *Smithy*. *Fred Ezra*, which involved a real estate broker's claim that a landlord owed it brokerage fees for the broker's efforts in introducing the landlord to a purchaser, plainly contemplates that a broker retained by a tenant could still have entered an implied-in-fact brokerage contract with the landlord. *Fred Ezra Co.*, 682 A.2d at 177. The court specifically held in *Fred Ezra* that the broker in that case could prove each of the three elements of an implied-in-fact contract and reversed the trial court's conclusion that it had failed to state a claim. *Id.* at 176–77. We therefore agree with the trial court's conclusion that in the context of the commercial real estate transaction in this case, the *Smithy*

requirements should not be parsed so literally, and the pivotal point with respect to the first element of an implied-in-fact contract was that Steuart Investment Company never quibbled with the suggestion that The Meyer Group, in keeping with an industry custom that recognizes the value of brokers' work to both parties, expected Steuart to pay its commission.

Steuart Investment Company argues, relatedly, that this court cannot find an implied-in-fact contract in this case without overruling our decision in *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 61 (D.C.2005), which Steuart cites, in both its opening and reply briefs, for the proposition that "[a] third party cannot be held liable under an implied contract for work done under an explicit contract between two different parties merely because the third party benefits from the work." Aside from the fact that the quoted language Steuart relies upon appears only in the *Jordan Keys* opinion's description of the trial court's conclusions in that case, and that this court's rejection of the appellant's implied-in-fact theory rested on the ground that the appellee had no notice that the appellant expected to be paid by the appellee, Steuart's contention also ignores a key factual difference between the circumstances in this case and those in *Jordan Keys*. That is, in this case, the agreement between The Meyer Group and CAL specifically noted that the *landlord* would be responsible for paying the broker's commission as a requirement of a signed lease,[8] and the lease executed by CAL and

8. The agreement states:

> We recognize that the landlord generally assumes responsibility for the commission of The Meyer Group, Ltd. and of any other licensed real estate broker whose cooperation is solicited. We will therefore cooperate and work with The Meyer Group, Ltd.

in its efforts to obtain its commission. In that regard, we shall inform the landlord of The Meyer Group, Ltd.'s representation of us before entering into any lease agreement. We shall also recognize and confirm The Meyer Group, Ltd. as the procuring cause of and in the said transaction. We

Steuart likewise noted that the *landlord* would be responsible for any commission owed to the broker.[9] These documents establish that all of the parties understood that Steuart would be paying The Meyer Group's commission, and that this was not a situation in which Steuart would be held accountable, out of the blue, for benefits it inadvertently gleaned from the relationship between two other contracting parties and that it had no reason to think it would be paying for.

 Turning to the second requirement of the test for establishing an implied-in-fact contract, much of the same evidence that establishes the first element also demonstrates that Steuart was on notice that The Meyer Group was not rendering its services gratuitously. It is true that "[w]here a party voluntarily does an act or renders a service, and there was no intention at the time that he should charge therefor, or an understanding, express or implied, that the other should pay, he will not be permitted to recover, for the law does not convert an intended gratuity into a legal obligation." *Woodruff v. New State*

*Ice Co.*, 197 F.2d 36, 38 (10th Cir.1952). But the facts of this case suggest just the opposite-that at every turn, William Meyer was asserting and reasserting that he was not volunteering his services and that he expected Steuart to pay him a 3 percent commission. Guy Steuart III testified that "having been a broker" himself, he recognized "that they don't work for free and that there would be compensation due for the services and the value rendered[.]" When the recipient of the broker services is put on notice, it must communicate opposition in order to avoid liability.[10] *See, e.g., Jordan Keys*, 870 A.2d at 62 (stating that "the 'implied-in-fact' contract theory [was] untenable" where the defendant refused to pay when notified of expectation of compensation). Here, however, the trial court found William Meyer to be credible in his description of his conversation with Steuart's representatives in which they told him that they had not received the commission letter (a claim the trial court characterized as "simply false") and further reassured him, without any conditions or reservations, that he would "get paid."

shall further require, as a condition of entering into a lease agreement, that the landlord undertake an obligation to pay a commission (in accordance with typical market rates) to The Meyer Group, Ltd., which obligation shall be set forth in the lease agreement or in a written side agreement.

9. The many indications in the record that throughout the lease negotiations Steuart intended to pay The Meyer Group's commission and that Steuart was familiar with the standard practice in the industry undermine any suggestion on Steuart's part that this was a situation in which it expected CAL to pay The Meyer Group's commission.

10. Under most circumstances, silence does not result in acceptance. *William F. Klingensmith, Inc. v. District of Columbia*, 370 A.2d 1341, 1343 (D.C.1977). However, we have adopted the exceptions in the Restatement (Second) of Contracts:

The Restatement (Second) carves out three exceptions to this general rule. The exception here relevant explains that silence will operate as an acceptance where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not inten[d] to accept. The comment to that section further explains that this exception requires either that the offeree has taken the offered benefits or that one party has relied upon the other party's manifestation of intention that silence may operate as an acceptance.

*Id.* (quotation marks and citations removed). Thus, "when the recipient knows or has reason to know that the services are being rendered with an expectation of compensation, and by a word could prevent the mistake, his privilege of inaction gives way." RESTATEMENT (SECOND) OF CONTRACTS § 69 (cmt b) (1981).

■ An implied-in-fact contract can be shown by facts demonstrating "a conscious appropriation of the labors of the broker." *Joseph P. Day Realty Corp. v. Chera*, 308 A.D.2d 148, 151, 762 N.Y.S.2d 373 (N.Y.App.Div.2003) (quoting *Sibbald v. The Bethlehem Iron Co.*, 83 N.Y. 378, 380 (1881)), and the record contains many such signs. Guy Steuart III's email to his brothers indicating that he knew William Meyer would "flip" when he learned that Steuart Investment Company was proposing to pay him only a 2 percent commission further confirms that Steuart knew Meyer was not working for free. This conclusion is bolstered by the uncontested expert testimony regarding trade practices in the commercial real estate broker context, the evidence that Steuart had paid The Meyer Group's commission in their prior dealings, and the unambiguous language in the newly negotiated lease providing that Steuart would pay the broker's commission.

Accepting the trial court's determination that The Meyer Group established the first two elements of an implied-in-fact contract, we turn to the third element: whether the services were beneficial to Steuart Investment Company. That Steuart benefited from The Meyer Group's services is clear from many aspects of the record, but perhaps none more than the myriad indications that Steuart misled William Meyer in order to ensure his continued participation for fear his departure would doom the negotiations. The trial court found that Steuart "acted to deceive" William Meyer about the payment of his commission "and this deception was designed to insure that an advantageous deal for [Steuart] would not be derailed by [Meyer's] discovery that he had been duped." In fact, Guy Steuart III "bluntly testified" that "he purposefully kept Meyer in the dark about how much [Steuart] was actually intending to pay him

so that Meyer would not stop working on a deal" that Steuart desired.

More generally, The Meyer Group assisted Steuart Investment Company by drafting the proposed ten-year lease, acting as an intermediary between Steuart and CAL, instructing the parties on standard terms and market rates, and ensuring that both parties secured their ultimate goal of a new ten-year lease, which Steuart preferred over a five-year renewal of CAL's original lease. According to William Meyer's testimony, the fact that Steuart had not hired its own broker to handle negotiations on the lease meant that he had to do more work to make the deal happen. As the trial court stated in its findings, "[s]chooling the landlord is something that a tenant's broker usually would not have to do." Any claim on appeal that The Meyer Group's services only benefited CAL is unsupported by the record. *Cf. Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 549 (D.C.1981) (Despite absence of formal compensation agreement, developer acquiesced to marketing specialist's participation and then invited and encouraged this participation; the developer could therefore not "persuasively deny that they were aware [the marketing specialist] acted on their behalf and was not acting gratuitously.").

We affirm the trial court's finding that Steuart Investment Company breached an implied-in-fact agreement to pay The Meyer Group's brokerage commission. Because we affirm the court's finding of an implied-in-fact contract, we need not reach the alternative equitable estoppel and unjust enrichment claims.

**B. Aggregate Lease Value and Rent Escalations**

On cross-appeal, The Meyer Group argues that the trial court erred by failing to include rent escalations in the aggregate

lease value. Steuart Investment Company counters that the trial court appropriately ignored rent escalations because they were never a part of any negotiations regarding The Meyer Group's commission.[11]

In its written findings of fact and conclusions of law, the trial court found the commission percentage to be 3 percent under all three theories of recovery based upon The Meyer Group's specific demand, the unchallenged expert testimony as to the industry standard, and the fact that Steuart paid The Meyer Group a 3 percent commission when it brokered Steuart's 1998 lease with CAL. The trial court also relied on the prior dealings of the parties as "the most reliable way" to define aggregate lease value, as the parties were "dealing with each other under peaceful circumstances and with all eyes open to the specific issues." Rent escalations were not included in the aggregate lease value in the 1998 lease agreement, and the trial court concluded that the implied-in-fact contract for the commission pertaining to the new ten-year lease likewise did not include "the element of rent escalation as part of the calculus for determining the commission."

After the court issued its findings, The Meyer Group filed a Motion to Amend Judgment, arguing that the trial court

erred when it excluded rent escalations from the implied-in-fact contract, and that its error stemmed from its mistaken reading of William Meyer's commission letters as excluding any mention of rent escalations when the letters actually did refer to such escalations.[12] In the view of The Meyer Group, both in its motion to amend and now on appeal, because the trial court relied so explicitly upon the commission letters in ascertaining the terms of the implied-in-fact contract, its oversight with respect to the letters' reference to rent escalations requires a revision of the terms of the implied contract to include rent escalations. Steuart counters that the trial court correctly relied on the definition of aggregate lease value as applied in the 1998 commission and excluded the escalations.

The Meyer Group is correct that the trial court's findings that the commission letters' "definition of aggregate rental value ... did not include escalation specifically" misapprehended the letters' terms, which in fact specifically included "any fixed escalations." The Meyer Group is also correct in characterizing the perceived absence of any reference to rent escalations in the commission letters as seemingly important to the trial court's analysis and conclusion.

11. Steuart Investment Company claimed that any commission should be calculated only on the second five years of the ten-year lease, as the first five years were merely an exercise of the five-year renewal option. The trial court found this assertion to be based on a "faulty premise" and "an entirely *post hoc* way to rationalize" the 2 percent commission offer from Steuart. Thus, the trial court "accord[ed] no credibility, legal validity, or value to the mix-and-match theory." We agree. The trial court found that the appropriate commission percentage was 3 percent, based on the commission letter, the historical dealings of the parties, and The Meyer Group's expert's testimony that 3 percent is the prevailing commission for the industry. Steuart

does not contest the applicable commission percentage on appeal.

12. The March 12, 2007, May 9, 2007, and June 20, 2007, commission letters each stated that in the event a lease "was successfully negotiated and executed" between the Center for Applied Linguistics and Steuart Investment Company, "Steuart Investment Company agrees to pay The Meyer Group, Ltd. a cash commission in the amount equal to Three Percent (3%) of the gross aggregate rental *including any fixed escalations,* less any free rent, up to a term of Ten (10) years, which shall include the expansion term if exercised." (emphasis added).

Yet in its order denying The Meyer Group's motion to amend the judgment, the trial court elaborated upon its basis for excluding rent escalations from the aggregate rental value. Specifically, the court stressed its reliance upon the prior dealings of the parties to define aggregate lease value and noted that "the inclusion of 'fixed escalations' was a sudden departure from what the parties had agreed to in the past." It stated that because there was no evidentiary basis for believing Steuart Investment Company had "realistically focused" on the rent escalation clause of the commission letters, and every reason to believe Steuart was "utterly fixated" instead upon the percentage of the commission, it would have been "unfair to infer that silence of the defendant or even comments about 'getting paid' was an acceptance of this unusual term."

■■■ Once it is determined that a contract exists, whether expressly or impliedly formed, it is the role of the trial court to resolve any "interpretative ambiguities." *Bracey v. Bracey*, 589 A.2d 415, 417 (D.C.1991). While the court interprets the unambiguous terms of a contract as a matter of law, where a contract is "reasonably susceptible of different constructions or interpretation, the meaning of the language must be evinced from extrinsic evidence on the intent of the parties—a factual determination." *District of Columbia v. District of Columbia Public Service Comm'n*, 963 A.2d 1144, 1155–56 (D.C.2009) (internal citations and quotation marks omitted). In such circumstances, where the trial court "will essentially have been acting as a finder of fact," we will reverse "only if the trial court's determination is 'plainly wrong or without evidence to support it.'" *Waverly Taylor,*

*Inc. v. Polinger*, 583 A.2d 179, 182 (D.C. 1990) (citing D.C.Code § 17–305(a) (1989)). The extrinsic evidence the trial court might consider includes the conduct and prior dealings of the parties, the circumstances surrounding the making of the contract, and industry standards. *Id.*

■■■ The trial court here weighed a variety of conflicting factors and made a factual determination that the implied-in-fact contract did not include rent escalations in its assessment of the aggregate lease value. Though it appeared initially to give weight to a misreading of the commission letters, when it subsequently addressed The Meyer Group's motion to amend, the court clarified that its review of the record and the circumstances of this case led it to conclude that while the parties' conduct could be read to support an implied-in-fact contract that Steuart would pay The Meyer Group the industry standard commission and the commission it had paid before, the facts could not support a conclusion that the implied contract included rent escalations as part of the aggregate value.[13] The court's decision to exclude these rent escalations was supported by the record and was not clearly erroneous. D.C.Code § 17–305 (2001).

## C. Prejudgment Interest

■■■ Finally, The Meyer Group challenges the trial court's refusal to grant it prejudgment interest. D.C.Code § 15–108 (2001) requires the award of prejudgment interest if "(1) the action is one to recover a liquidated debt, and (2) interest is payable on that debt by contract or by law or usage." *District Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 731 (D.C.2003);

---

13. Judge Long found "that there is no proof of any meeting of the minds or common understanding between plaintiff and defendant as to how to define the 'aggregate lease value' of the new 10–year deal for CAL."

D.C.Code § 15–108.[14] "A liquidated debt is one which at the time it arose ... was an easily ascertainable sum certain." *District of Columbia v. Pierce Assoc., Inc.*, 527 A.2d 306, 311 (D.C.1987) (citation and internal quotation marks omitted).

The Meyer Group argues that because the commission letters clearly outlined the methodology for calculating the commission, the sum was liquidated at the time the parties executed the new ten-year lease and The Meyer Group qualified for prejudgment interest pursuant to D.C.Code § 15–108. Steuart Investment Company argues, on the other hand, that the court correctly denied prejudgment interest as the sum was not easily ascertainable.

 The trial court repeatedly emphasized that the focus of the parties' dispute was the percentage commission that would be paid. Beyond that, even The Meyer Group's expert witness testified that there are "some variable components" in calculating aggregate lease value. A "reasonable person in the position of the parties" could have believed the aggregate lease value to be exclusive of rent escalations, based on the definition the parties used when Steuart paid The Meyer Group's commission in 1998, or inclusive of rent escalations, pursuant to industry standards and the commission letters. *Fairfax Vill. Condo. VIII Unit Owners' Ass'n v. Fairfax Vill. Cmty. Ass'n*, 726 A.2d 675, 677 n. 4 (D.C.1999). The court reasonably relied upon the definition of aggregate lease value used in 1998 and the lack of evidence that this provision was negotiated by the parties in 2007 and 2008. As the trial court also noted, the propriety of awarding prejudgment interest was intertwined with the rent escalation issue, and the uncertainty over the inclusion of rent escalations and the necessity of litigation to settle the dispute over what constituted aggregate lease value in this case bolster the trial court's finding that the sum due was indefinite and therefore outside the scope of § 15–108.[15]

Even if the debt at issue were liquidated,[16] The Meyer Group has not satisfied the second prong of § 15–108, which makes the award of prejudgment interest

**14.** The Meyer Group does not take issue with the trial court's refusal to grant prejudgment interest pursuant to D.C.Code § 15–109 (2001), which allows the trial court to grant interest on unliquidated sums if necessary to make a party whole. *See, e.g., Bassin*, 828 A.2d at 732 n. 4.

**15.** That The Meyer Group's demand has fluctuated over the course of this litigation is further evidence that the sum was not easily ascertainable. *See, e.g., Hartford Accident & Indem. Co. v. District of Columbia*, 441 A.2d 969, 974 (D.C.1982) ("[T]he amounts claimed by Heller for the unpaid balance of the contract ... fluctuated throughout the litigation and were thus not liquidated."); *District of Columbia v. Campbell*, 580 A.2d 1295, 1300–01 (D.C.1990) ("Such fluctuation in itself likely would be sufficient grounds for us to conclude that the damages Campbell claimed were unliquidated."); *Fudali v. Pivotal Corp.*, 623 F.Supp.2d 11, 18 (D.D.C.2008) ("The best

evidence of this is plaintiff's own inability to ascertain what she was owed.").

**16.** We are aware of no authority indicating that for purposes of determining whether § 15–108 required the award of prejudgment interest in this case, we could view the debt at issue as *partially* liquidated based upon the trial court's conclusion that the parties at the very least contemplated an industry standard 3 percent commission. As The Meyer Group has not made this argument and as it has not, in any event, met the second prong of § 15–108, *see infra*, we need not address the issue. *See Regional Redevelopment Corp. v. Hoke*, 547 A.2d 1006, 1011 n. 5 (D.C.1988) (stating that "[w]hether any fraction of the ... award, representing an admitted minimum percentage commission customarily paid, might be considered 'liquidated' is an issue not argued on appeal and which we therefore do not reach").

mandatory only if interest on that liquidated debt "is payable by contract or by law or usage[.]" D.C.Code § 15–108. The Meyer Group concedes that it has no contractual entitlement to interest, and relies instead upon language from *Bragdon v. Twenty–Five Twelve Assocs. Ltd. P'ship*, 856 A.2d 1165, 1171–72 (D.C. 2004)—specifically, our observation that "it is indeed customary to pay interest on funds that are withheld and not paid when due," *id.* at 1172 (quoting *Bassin*, 828 A.2d at 731)—to support its argument that common law or customary usage requires the payment of prejudgment interest on the type of debt at issue in this case. Yet *Bragdon* and *Bassin* (the case *Bragdon* quotes) both involved overpayments: *Bragdon* addressed overcharges in the daily rental rate of a community residence facility, 856 A.2d at 1171–72, while *Bassin* involved the payment of excessive late fees charged by a cable television service provider, 828 A.2d at 731. Unlike the broker's commission at issue in this case, such overpayments, which are in some ways comparable to loans, presume the payment of interest. *See, e.g., Bassin*, 828 A.2d at 731 ("In this case there is no dispute that the second condition is satisfied, presumably because it is indeed customary to pay interest on funds that are withheld and not paid when due (as the late fees charged by [the cable provider] might be said to illustrate.)") (citation omitted). The Meyer Group presented no evidence demonstrating that in the real estate industry, interest would customarily be paid on a brokerage commission, and we do not read *Bragdon's* and *Bassin's* references to "funds that are withheld and not paid when due" to encompass a debt so unlike the overcharges at issue in those cases. Accordingly, we affirm the trial court's denial of prejudgment interest.

### III. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in favor of The Meyer Group in the amount of $166,046.76.

*So ordered.*